814 P.2d 333

**STATE of Arizona, Appellee,**

v.

**Alfred Edward LAVERS, III, Appellant.**

**No. CR–89–0298–AP.**

Supreme Court of Arizona,
En Banc.

July 23, 1991.

Certiorari Denied Oct. 21, 1991.

See 112 S.Ct. 343.

---

Grant Woods, Atty. Gen., Paul J. McMurdie, Atty. General's Office, Chief Counsel, Crim. Appeals Section, Joseph T. Maziarz, Asst. Atty. Gen., Phoenix, for appellee.

George M. Sterling, Jr., Phoenix, for appellant.

## OPINION

GORDON, Chief Justice.

Alfred Edward Lavers, III (defendant) appeals from his convictions and death sentences for two counts of first degree murder. We have jurisdiction of this automatic appeal pursuant to Ariz. Const. art. 6, § 5(3), and A.R.S. §§ 13–4031, –4033, and –4035.

## ISSUES PRESENTED

On appeal, defendant raises the following issues: (1) Whether the trial court erred as a matter of law by refusing to exclude the audio tape cassette; (2) Whether the trial court committed fundamental error by allowing the prosecution to convict defendant and successfully seek the death penalty upon an allegation in count I of the indictment that alleged only the lesser culpable mental state of "knowingly"; (3) Whether the trial court abused its discretion by denying defendant's request to excuse, for cause, a prospective juror who indicated that prior TV broadcasts concerning the case "would haunt [his] mind" during deliberations; (4) Whether the prosecution could, without relying upon the specific contents of the tape, properly establish the necessary foundation for admitting the tape in evidence; (5) Whether the murder of Jennifer Burns can qualify as a murder committed "in an especially heinous, cruel or depraved manner"; (6) Whether the murder of Jennifer Burns was committed during the murder of Mary Lavers, and whether the murder of Mary Lavers was committed during the murder of Jennifer Burns; (7) Whether the murder of Mary Lavers can be characterized as "especially cruel" when an apparent motive for defendant's last act was to forestall her further suffering; (8) Whether the trial court erred in reducing or discounting the mitigating factors of defendant's mental impairment, intoxication, and previous good citizenship; (9) Whether the mitigating circumstances evidenced by defendant are, even if ever so slightly, sufficiently substantial to call for leniency and a life sentence; (10) Whether the prosecutor denied defendant due process of law by honoring a routine in which

the murder victim's family's wishes are "the deciding factor" in the prosecutor's decision to seek the death penalty; and (11) Whether the trial court's order that defendant pay restitution of $18,797.60 for funeral expenses should be reduced or credited with payments from life insurance policies that defendant provided to Mary Lavers and Jennifer Burns. We address each of these issues, but do not address them in the same order as presented by defendant.

## FACTUAL AND PROCEDURAL BACKGROUND

Defendant lived in apartment 2021 of the Arabian Trail Apartments in Phoenix with his wife, Mary Lavers (Mary), and her eleven-year-old daughter, Jennifer Burns (Jennifer or Jennie). At approximately 1:00 a.m. on November 13, 1988, defendant and Mary began arguing. At some point, Jennifer apparently turned on a cassette tape recorder and placed it between the pillows on her bed. During the argument, defendant told Mary that by refusing to get into bed as he ordered her to do, she was "mak[ing] a mistake" that she might not "have to live with for very long."[1]

Defendant confronted Mary and Jennifer as they prepared to leave the apartment. When defendant, who by then was armed with a knife, asked, "[t]hink I'd hurt you," Mary stated that she believed he would and Jennifer implored him twice to "[j]ust put the knife away and we won't think you will hurt us any more." When Jennifer said something else to defendant, he evidently cut her on the left wrist with the knife. Mary shouted out, "JENNIE, JENNIE, JENNIE, JENNIE, it's all right," as Jennifer cried. Defendant then stabbed Mary in the middle of her back, nearly severing her spinal cord and paralyzing her from the wound down. Mary screamed out "stop it, help" as defendant apparently chased Jennifer out of the apartment. She also cried out, "I'm dying, I'm paralyzed," and "[h]elp I can't move, I can't move. What did you do to JENNIE, what did you do to JENNIE."

At about 1:15 a.m., a resident in apartment 1021 heard "very loud pounding" on his front door. He called 911, but later called back and cancelled the call after deciding that "pranksters" had done the pounding. One or two minutes later, he heard "a moaning sound" outside the door and again called 911.

Meanwhile, defendant had returned to Jennifer's bedroom. He stated, "[y]ou should have been smart MARY." When Mary asked where Jennifer was, defendant responded, "[s]he's dying." Defendant apologized to Mary and told her he loved her, but blamed her for "push[ing] it." When Mary stated, "I'm dying," defendant responded, "I know you are." When Mary pleaded with defendant to help her, defendant responded, "[y]ou're bleeding just like a stuck hog, I love you so much." While Mary continued to ask for help and to complain about the pain she was experiencing, defendant continued to apologize and to blame Mary. When Mary asked whether defendant had killed Jennifer, he responded, "[s]he's gone MARY."

At some point, defendant armed himself with a .22 caliber revolver and promised to "take myself out too so we'll go together." When Mary begged, "please don't shoot me," defendant said, "I'm not gonna shoot you honey." Defendant then asked Mary to get up, but she told him that she was paralyzed. Defendant responded, "[h]oney, you're not paralyzed, get up, you're just lazy."

Defendant told Mary he would look to see if he could find Jennifer. When he returned to the bedroom, he told Mary, "JENNIE'S nowhere to be seen." Mary repeatedly begged defendant not to shoot her and stated that she was afraid of "[t]he bullet, the pain, the bullet." By approximately 2:00 a.m., Jennifer's tape recording ended.

The police found Jennifer lying by the front door of apartment 1021. Her eyes were open and she was in a "semiconscious" state, bleeding profusely from a

---

1. All quotations in this opinion attributed to defendant, Mary, or Jennifer are taken from a transcript of the tape recording unless noted otherwise.

chest wound and "gurgling" saliva and air bubbles from her mouth. She was pronounced dead within fifteen to twenty minutes of her arrival at John C. Lincoln Hospital.

After the police determined that Jennifer probably lived in apartment 2021, they knocked on the door to the apartment and announced that it was the police and that they were about to enter. As they began to put a pass key into the lock, the police heard Mary shout out, "[p]lease don't come in, he has got a gun, he will kill you." The officers then retreated down the stairway and called in the Special Assignments Unit (SAU).

SAU members began arriving at approximately 3:00 a.m., using the apartment directly below apartment 2021 as a staging area. While there, they could hear "moaning" coming from above them in apartment 2021. At 4:37 a.m., several officers heard a gunshot coming from apartment 2021. Defendant had shot Mary through the top of the head with a .22 caliber handgun at extremely close range. At 6:41 a.m., after negotiation attempts had failed, the police entered the apartment and arrested defendant.

Meanwhile, the police had obtained a search warrant for apartment 2021 that permitted a search for several named items as well as "ANY AND ALL EVIDENCE RELATING TO THE HOMICIDE OF JENNIFER BURNS W/F 15YR." When executing the search warrant, the police found a small cassette tape recorder on Jennifer's bed between and under two pillows. Because Detective Wheelis could see a tape inside the recorder, he picked up the recorder and pushed the play button, but it would not play. After partially rewinding the tape to determine if the recorder was functioning, he completely rewound the tape and listened to it. The detectives then determined that the tape had evidentiary value and seized it. Jennifer's fingerprints were found on the recorder.

On November 17, 1988, defendant was indicted for two counts of first degree murder. Count I alleged that defendant, "knowing that his conduct would cause death, with premeditation caused the death of JENNIFER BURNS...." Count II alleged that defendant, "intending or knowing that his conduct would cause death, with premeditation caused the death of MARY LOUISE LAVERS...."

Defendant filed a motion to dismiss, or, in the alternative, to remand the indictment for a new finding of probable cause. He claimed that the State denied him due process by failing to allege that he acted "intentionally" in count I. The trial court denied this motion. Defendant also filed a motion to suppress papers seized during the search of his apartment, claiming that the description in the search warrant of the items to be seized was not sufficiently precise and was a general warrant in violation of the state and federal constitutions. The trial court also denied this motion, but precluded the State from using confidential communications between attorney and client.

The State filed a motion to preclude evidence of intoxication and a motion to determine the admissibility of the tape recording. The court refused to exclude evidence of defendant's intoxication, at least as to count II, and found the tape admissible, subject only to proper foundation.

The jury found defendant guilty on both counts of first degree murder. At the presentence hearing, Dr. Heinz Karnitsching testified that the knife wound to Jennifer's chest was painful, and that a person suffering such a wound would not necessarily lose consciousness. Dr. George Bolduc testified that Mary died as a result of the gunshot wound to her head and the stab wound to her back. The stab wound caused paralysis below the level of the injury, rendering Mary unable to stand, walk, or use her legs to crawl. Despite the paralysis, Mary would have experienced pain after being stabbed, and any movement would have exacerbated the pain. The stab wound was not immediately fatal, and Mary could have survived if she had received timely medical treatment. The stab wound did not leave Mary unconscious, and she could have remained con-

scious for "several hours or longer." Mary was still alive at the time she was shot.

Psychologist Donald Tatro testified on behalf of defendant. He diagnosed defendant as having a "delusional paranoid disorder, jealous type," which exists within the context of an "obsessive-compulsive personality disorder." He also testified that appellant appeared to have a long-standing form of alcoholism known as "alcohol dependence, binge type." He opined that defendant was "extremely intoxicated" at the time of the murders and was experiencing "delusions" that Mary and Jennifer were engaging in sexual relations with Mary's ex-husband. He also testified that defendant's use of alcohol on the night in question was "a precipitating factor." He concluded that defendant's ability to perceive the wrongfulness of his acts or to conform his conduct to the requirements of the law was "grossly impaired." Finally, he opined that defendant would "adjust quite well" to prison and "would be a model prisoner."

In reaching his diagnosis, Dr. Tatro relied upon the truthfulness of what defendant told him despite the fact that defendant told the trial court he had lied to Dr. Tatro. He also acknowledged that he took no steps to confirm the history defendant provided, that he did not listen to the tape recording, and that defendant had no indications of organic brain disorders.

The State rebutted Dr. Tatro's testimony with testimony from psychiatrist Alexander Don. Although Dr. Don was not able to form an opinion as to defendant's mental state at the time of the murders, he found "insufficient psychiatric symptomology" to support Dr. Tatro's "diagnosis of delusional paranoid disorder, jealous type." He also testified that there was an insufficient basis to support Dr. Tatro's diagnosis that defendant had an "obsessive-compulsive personality disorder" and an "alcohol dependence, binge type." Additionally, Dr. Don opined that the "psychodynamic theory" that Dr. Tatro used "remains a hypothesis not scientifically proven" and is not useful in a legal context. Finally, Dr. Don testified that if Dr. Tatro had relied upon

false information that defendant provided, his diagnosis would be undermined even if his theory were scientifically accepted.

Defendant testified at the presentence hearing. During cross-examination, he admitted that he had been arrested and charged with criminal trespass and aggravated assault in Tucson in August 1988 as the result of an altercation with Mary. These charges were dropped because Mary decided not to prosecute. Defendant also admitted that he was arrested and charged with aggravated assault in Maryland in January 1984 after his ex-wife complained to the police that he had pointed a .357 caliber handgun at her head and threatened to kill her. This charge was dropped at his ex-wife's request.

On September 11, 1989, the trial court issued its special verdict. For count I, the murder of Jennifer, the court found that the State had proved beyond a reasonable doubt three statutory aggravating circumstances: (1) defendant was an adult at the time of the murder and Jennifer was under fifteen years of age, (2) defendant was convicted of another homicide (count II) committed during the commission of Jennifer's murder, and (3) the murder was committed in an especially cruel manner. For count II, the murder of Mary, the court found that the State had proved beyond a reasonable doubt two statutory aggravating circumstances: (1) defendant was convicted of another homicide (count I) committed during the commission of Mary's murder, and (2) the murder was committed in an especially cruel, heinous, and depraved manner.

In mitigation of both counts, the trial court found that defendant had proved by a preponderance of the evidence that his ability to appreciate the wrongfulness of his conduct was "impaired to some extent." The court stated, however, that "[i]t seems incongruous that the defendant's mental and emotional disorders being the cause of these murders can also require leniency because his capacity to appreciate the wrongfulness of his conduct was significantly impaired." It also found that defendant's lack of a prior felony record was a

mitigating circumstance, but this circumstance should be considered along with defendant's "two prior arrests involving domestic violence situations." Additionally, the court found that defendant's military and employment record and his conduct while incarcerated were mitigating circumstances. The court, however, stated that defendant's conduct while incarcerated "is not entitled to great weight." The court found that defendant's conduct during trial was not a mitigating factor because of defendant's "conflicts with counsel" and "untimely and unsupported requests of the Court."

The trial court found beyond a reasonable doubt that the mitigating circumstances "taken individually and as a whole" were not sufficient to call for leniency. Accordingly, it imposed death sentences on both counts. It also ordered defendant to pay restitution totalling $18,797.60 to the family and $200 to the Victims' Compensation Fund. This automatic appeal followed.

## ADMISSIBILITY OF THE TAPE RECORDING

### A. *Search and Seizure*

Defendant argues that the warrant in this case is illegal because it was intentionally overbroad. He also argues that the search was illegally extended because the police officers' "distinctly separate and later step" of listening to the tape recording to determine its evidentiary value requires separate court supervision.

█ The search warrant authorized the search for and seizure of the following items:

(1) KNIFE

(2) HANDGUN AND/OR LONG GUNS

(3) AMMUNITION

(4) BLOOD

(5) DOCUMENTATION SHOWING RESIDENCY OF 16636 N 58 ST APT # 2021

(6) PHOTOGRAPHS & FINGERPRINTS

(7) ANY AND ALL EVIDENCE RELATING TO THE HOMICIDE OF JENNIFER BURNS W/F 15YR.

Defendant argues that the clause permitting the seizure of "any and all evidence relating to" Jennifer's murder renders the warrant overbroad. We disagree.

The United States Supreme Court previously considered and rejected a similar argument. In *Andresen v. Maryland,* the petitioner argued that warrants containing an "exhaustive list of particularly described documents" were rendered fatally "general" by the addition of the phrase "together with other fruits, instrumentalities and evidence of crime at this [time] unknown." 427 U.S. 463, 479, 96 S.Ct. 2737, 2748, 49 L.Ed.2d 627 (1976). Although the Court acknowledged that the fourth amendment prohibits general warrants, *id.* at 480, 96 S.Ct. at 2748, it rejected the petitioner's argument. As in this case, "[t]he warrants ... did not authorize the executing officers to conduct a search for evidence of other crimes but only to search for and seize evidence relevant to the crime [identified in the warrant]." *Id.* at 481–82, 96 S.Ct. at 2749 (footnote omitted). Likewise, this court rejected similar arguments in two cases in which the warrants authorized the search for named items and "any other evidence." *State v. Prince,* 160 Ariz. 268, 272–73, 772 P.2d 1121, 1125–26 (1989); *State v. Moorman,* 154 Ariz. 578, 583, 744 P.2d 679, 684 (1987). We believe the warrant in this case is substantially similar to the warrants in *Andresen, Prince,* and *Moorman,* and therefore hold that it is not unconstitutionally overbroad.[2]

---

**2.** Defendant argues that this case is distinguishable from *Andresen* because the warrant did not contain *Andresen's* "exhaustive list of particularly described documents" that "were models of particularity." We reject this argument for two reasons.

First, we note that the warrant in *Andresen* contained an exhaustive list because "[u]nder investigation was a complex real estate scheme whose existence could be proved only by piecing together many bits of evidence." *See Andresen,* 427 U.S. at 480 n. 10, 96 S.Ct. at 2748 n. 10. Because no such complex crime is at issue in this case, there was no reason for an "exhaustive list."

In addition to challenging the scope of the warrant, defendant argues that the tape recording was the product of an illegally extended search because the police did not know the evidentiary value of the recording until after they listened to it. Citing *State v. Shinault*, 120 Ariz. 213, 584 P.2d 1204 (App.1978), and *State v. Davis*, 154 Ariz. 370, 742 P.2d 1356 (App.1987), defendant contends that listening to the tape is a separate step that requires "distinct and specific Court supervision." Under the facts of this case, we disagree.

Initially, we note that defendant did not raise this argument in the trial court, and has therefore waived it absent fundamental error. *See, e.g., State v. Thomas*, 130 Ariz. 432, 435, 636 P.2d 1214, 1217 (1981). We must therefore determine whether it was fundamental error for the trial court to admit the tape recording. Before we may engage in a fundamental error analysis, however, we must first find that the trial court committed some error. *See id.* at 436, 636 P.2d at 1218; *State v. King*, 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988). For the reasons stated below, we find no such error in admitting the tape recording.

"Assuming that a warrant meets the constitutional requirements of particularity, the descriptions provided are highly relevant in determining the permissible scope and intensity of the search which may be undertaken pursuant to the warrant." 2 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.10 (2d ed. 1987). "Places within the described premises are not excluded merely because some additional act of entry or opening may be required." *Id.* § 4.10(a). As the Supreme Court stated in *United States v. Ross:*

> Second, this court has approved the use of similar clauses in two cases in which there were no "exhaustive lists" of items to be seized. In *Prince*, the warrant authorized a search for two weapons before authorizing the search for "[a]ny other evidence." 160 Ariz. at 272–73, 772 P.2d at 1125–26. In *Moorman*, the warrant authorized a search for a "pillow case used to suffocate victim, knives, receipts, blood stains, victims [sic] identification and any other evidence." 154 Ariz. at 583, 744 P.2d at 684. The lists in *Prince* and *Moorman* were no more

A lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. Thus, a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found....

. . . .

As Justice Stewart stated in *Robbins [v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981)] the Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view. 453 U.S., at 427, 101 S.Ct., at 2846 (plurality opinion). But the protection afforded by the Amendment varies in different settings.... *A container that may conceal the object of a search authorized by a warrant may be opened immediately; the individual's interest in privacy must give way to the magistrate's official determination of probable cause.* 456 U.S. 798, 820–23, 102 S.Ct. 2157, 2170–72, 72 L.Ed.2d 572 (1982) (footnotes omitted) (emphasis added).

Applying these principles, we conclude that the police did not illegally extend the search by playing the tape. The warrant authorized the search for several named items as well as "any and all evidence relating to" Jennifer's murder. Because there can be no doubt that the contents of the tape recording constitute evidence relating to the murder, those contents are within the scope of the warrant. Moreover, under the circumstances of this case,[3] we believe it was reasonable for the police to conclude that the tape recording was

"exhaustive" than the list of items in this case, yet we upheld the warrants in both cases.

3. The recorder was found in Jennifer's bedroom, the same room in which Mary's body was found, between and under two pillows on the bed. The recorder was off when found, and the tape was in the recorder and had played to the end. Under these circumstances, the potential evidentiary significance of the tape was apparent even before it was played.

"[a] container that may conceal the object of a search authorized by a warrant." Therefore, under *Ross* the recording could "be opened [i.e., played] immediately" without an additional warrant. *See United States v. Gomez–Soto*, 723 F.2d 649, 654–55 (9th Cir.) (using similar reasoning in holding search and seizure of a microcassette proper), *cert. denied*, 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 831 (1984); *cf. United States v. Falcon*, 766 F.2d 1469, 1476 (10th Cir.1985) ("once the agents were justified in seizing the tape, no additional authority was necessary for the agents to play the tape"); *United States v. Bonfiglio*, 713 F.2d 932, 937 (2d Cir.1983) (same).[4]

For the reasons stated above, we conclude that the warrant was valid and the search was not illegally extended. Thus, the trial court did not err by denying defendant's motion to suppress.

### B. *Foundation*

Defendant argues that the State offered no evidence, other than the contents of the tape itself, to establish the relevancy of the tape and the time period of its origination. He also argues that because the State failed to establish the proper foundation for the admissibility of the tape, the contents of the tape are inadmissible and hearsay devoid of any indicia of reliability that would justify denying defendant "his absolute right to confrontation" under the United States and Arizona Constitutions.

■ Rule 901(a) of the Arizona Rules of Evidence governs the sufficiency of an evidentiary foundation. It indicates that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." Ariz.R.Evid. 901(a), 17A A.R.S.; *see State v. Romanosky*, 162 Ariz. 217, 224, 782 P.2d 693, 700 (1989). Authentication and identification are aspects of relevancy that are a condition precedent to admissibility. *United States v. Brewer*, 630 F.2d 795, 801 (10th Cir.1980) (quoting J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 901(a)[02] (1978)).

■ The trial judge must be satisfied that the record contains sufficient evidence to support a jury finding that the offered evidence is what its proponent claims it to be. The judge does not determine whether the evidence is authentic, but only whether evidence exists from which the jury could reasonably conclude that it is authentic. *State v. Irving*, 165 Ariz. 219, 223, 797 P.2d 1237, 1241 (App.1990) (citing 1 M. Udall and J. Livermore, *Arizona Practice—Law of Evidence* § 111, at 221–22 (2d ed. 1982)); *see also United States v. Long*, 857 F.2d 436, 442 (8th Cir.1988) ("To authenticate a document, the proponent need only prove a rational basis for the claim that the document is what the proponent asserts it to be.") (citations omitted); 5 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 901(a)[01] (1990) ("The rule requires only that the court admit evidence if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification."). The judge's decision to admit a sound recording into evidence is subject to reversal only for a clear abuse of discretion. *United States v. O'Connell*, 841 F.2d 1408, 1422 (8th Cir.), *cert. denied*, 487 U.S. 1210, 108 S.Ct. 2857, 101 L.Ed.2d 893 (1988), and *cert. denied*, 488 U.S. 1011, 109 S.Ct. 799, 102 L.Ed.2d 790 (1989); *United States v. Mouton*, 617 F.2d 1379, 1384 (9th Cir.), *cert. denied*, 449 U.S. 860, 101 S.Ct. 163, 66 L.Ed.2d 77 (1980); *see Romanosky*, 162 Ariz. at 224, 782 P.2d at 700 ("Absent a clear abuse of discretion, we will not disturb a trial court's ruling on the admissibility of evidence.") (citation omitted).

■ Because of the evident dangers of admitting sound recordings into evidence at criminal trials, *United States v. King*, 587 F.2d 956, 960 (9th Cir.1978); *United States*

---

**4.** Defendant cites *Shinault* and *Davis* for the proposition that listening to the tape is a separate step that requires a warrant. These cases are easily distinguishable, however, because in neither case did the police have a valid warrant that permitted the search for and seizure of the item at issue. *See Gomez–Soto*, 723 F.2d at 654 (distinguishing cases requiring a warrant to open a locked container because they all dealt with *unwarranted* searches).

*v. Biggins,* 551 F.2d 64, 66 (5th Cir.1977), some courts have adopted rigid guidelines for the admission of such evidence.[5] Others, such as the Ninth Circuit, have adopted a more flexible approach that defers to the trial judge's discretion and requires only that the judge "be satisfied that the recording is accurate, authentic, and generally trustworthy." 5 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 901(b)(5)[02] n. 15 (1990) (quoting *King,* 587 F.2d at 961).[6] Additionally, at least one of the courts that follows the more rigid approach relaxes it when the tape is one found in the defendant's possession rather than one produced by government agents. In *O'Connell,* the Eighth Circuit noted that courts have applied the *McMillan*[7] requirements primarily to sound recordings that involved the use of a recorder by or at the request of government agents. The court then stated its belief that when the recording was made by a defendant, "mechanical or wooden application of the *McMillan* requirements is [not] necessary." *O'Connell,* 841 F.2d at 1420. Under such circumstances, "the considerations underly-ing the *McMillan* test should be applied in a practical light to assure the reliability of the recorded material." *Id.; see also United States v. Kandiel,* 865 F.2d 967, 974 (8th Cir.1989) (following *O'Connell*); *State v. Garrett,* 386 S.E.2d 823, 833–34 (W.Va. 1989) (requirement of seven foundational elements is limited to situations in which police or their agent control creation of a tape; where police had no control, tape is admissible if the trial court is satisfied that it "was properly seized without coercion, preserved by the police and identified"); *Wigfall v. State,* 257 Ga. 585, 586, 361 S.E.2d 376, 378 (1987) (seven foundational requirements do not apply when tape of murder was made by defendant and not by state officials during custodial interrogation). *But see State v. Jarvis,* 56 N.C.App. 678, 681, 290 S.E.2d 228, 231 (1982) (seven foundational requirements should apply when recordings are made by victims before police intervention).

Because the tape recording in this case was not produced by or at the request of government agents, but was found in de-

---

5. In *United States v. McKeever,* the court established guidelines under which the proponent must show that: (1) the recording device was capable of taking the conversation offered in evidence; (2) the operator was competent to operate the device; (3) the recording is authentic and correct; (4) changes, additions, or deletions have not been made; (5) the recording has been properly preserved; (6) the speakers are identified; and (7) the conversation was made voluntarily and in good faith, without any kind of inducement. 169 F.Supp. 426, 430 (S.D.N.Y. 1958), *rev'd on other grounds,* 271 F.2d 669 (2d Cir.1959). Of the federal courts of appeals, only the Third and Eighth Circuits explicitly follow the *McKeever* guidelines. 5 J. Weinstein and M. Berger, *Weinstein's Evidence* ¶ 901(b)(5)[02] (1990). A number of states also follow these guidelines. *See* Annotation, *Admissibility of Sound Recordings in Evidence,* 58 A.L.R.2d 1024, 1027–28 (1958) (listing the seven foundational requirements and stating that "the cases are in general agreement as to what constitutes a proper foundation for the admission of a sound recording").

6. *See also United States v. Reed,* 887 F.2d 1398, 1405 (11th Cir.1989) (although the preferred practice is for government to produce evidence regarding the competence of the operator, fidelity of equipment, absence of alterations, and identity of speakers, the trial court has broad discretion to admit tapes without such a showing if there is independent evidence of accuracy), *cert. denied,* 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990); *United States v. Smith,* 692 F.2d 693, 698 (10th Cir.1982) (stating that the varying circumstances of particular cases militate against adopting inflexible criteria applicable to all cases); *United States v. Slade,* 627 F.2d 293, 301 (D.C.Cir.) (admission of tape recordings is within discretion of trial judge; tapes must be "authentic, accurate and trustworthy"), *cert. denied,* 449 U.S. 1034, 101 S.Ct. 608, 66 L.Ed.2d 495 (1980); *United States v. Fuentes,* 563 F.2d 527, 532 (2d Cir.) (stating that the *McKeever* guidelines are valuable, but the varying circumstances of particular cases militate against adopting inflexible criteria applicable to all cases), *cert. denied,* 434 U.S. 959, 98 S.Ct. 491, 54 L.Ed.2d 320 (1977); *Biggins,* 551 F.2d at 66–67 (generally requiring four of the seven foundational requirements, but stating that "[i]f the trial judge independently determines that the recording accurately reproduces the auditory evidence ... his discretion to admit the evidence is not to be sacrificed to a formalistic adherence to the standard we establish").

7. The Eighth Circuit refers to the seven foundational requirements as the *McMillan* requirements. The *McMillan* requirements are identical to the *McKeever* requirements discussed *supra* in note 5.

fendant's apartment and apparently made by a victim of the crime, we decline to apply the rigid *McKeever* guidelines. Rather, we adopt the flexible standard that the Ninth Circuit has adopted. We hold that, under these circumstances, a proper foundation for the introduction of a sound recording has been made if "the trial court, in the exercise of its judicial discretion, [is] satisfied that the recording is accurate, authentic, and generally trustworthy." *See King,* 587 F.2d at 961.

■ Applying these principles, we conclude that the State laid a proper foundation for the introduction of the tape recording into evidence. The trial court specifically found that a reasonable foundation had been laid for the admission of the tape. We find adequate circumstantial evidence in the record to support the trial court's conclusion that the tape is authentic.[8] The tape, which was found in a recorder, was seized immediately following the events in question from the room in which Mary's body was located. The police examined the recorder and determined that it was functional and capable of making a recording. The chain of custody was clearly established. Mary's sister recognized and identified the only voices on the tape, those of defendant, Mary, and Jennifer.

We reject defendant's argument that no evidence, other than the contents of the tape recording itself, indicated that the tape recording was contemporaneous with the crime. The record contains sufficient circumstantial evidence to establish that the recording was made during the commission of the crime. At the point on the tape where the screaming began, Jennifer's voice grew fainter as if moving away and the sound of defendant's voice disappeared. This is consistent with Jennifer going out-

side and being stabbed in front of apartment 1021, where the police found her. It also helps establish the recording as being made during the commission of the crime because a neighbor testified that he heard pounding on his door at about 1:15 on the morning of the crime. Additionally, the transcript contains a statement by Mary that she was paralyzed, a statement that indicates that the recording was made during the commission of the crime. This statement was independently corroborated by medical testimony that the knife wound Mary suffered would paralyze her below the point of the wound. Finally, defendant's statement that the police were outside related the time of the tape recording to the time of the crime. We therefore hold that the trial judge did not abuse her discretion in admitting the tape recording into evidence.[9]

■ We also reject defendant's argument that admitting the tape violated his right to confrontation under the Sixth Amendment to the United States Constitution and Article 2, § 24 of the Arizona Constitution. In a case involving a tape recording admitted into evidence, we stated:

There is a two-pronged analysis in this state to evaluate confrontation clause claims. *State v. McCall,* 139 Ariz. 147, 677 P.2d 920 (1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). First, the declarant must be unavailable; second, the statement itself must be reliable. *State v. Martin,* 139 Ariz. 466, 679 P.2d 489 (1984).

*State v. Gortarez,* 141 Ariz. 254, 260, 686 P.2d 1224, 1230 (1984). In this case, both prongs are met. First, none of the declarants on the tape were available at trial,

---

**8.** Circumstantial evidence may be used to prove the authenticity of a recording. *United States v. Bright,* 630 F.2d 804, 819 (5th Cir.1980); *United States v. Haldeman,* 559 F.2d 31, 107 (D.C.Cir. 1976), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977); *see Kandiel,* 865 F.2d at 974 ("We believe the government has offered sufficient circumstantial evidence to establish the prima facie authenticity and correctness of the tapes.").

**9.** We have found only one case in which the victim of a murder recorded the event, and it is consistent with our conclusion that the tape recording was properly admitted. *See State v. Smith,* 85 Wash.2d 840, 847, 540 P.2d 424, 428–29 (1975). We have also found one case in which the defendant recorded a murder. In *Wigfall,* the Georgia Supreme Court found that the seven foundational requirements for admitting a sound recording do not apply in such a case. 257 Ga. at 586, 361 S.E.2d at 378.

Mary and Jennifer because they were dead and defendant because he had a fifth amendment right not to testify. Second, we believe the factors discussed above that establish the tape's authenticity also establish its reliability for purposes of the confrontation clause. Thus, we hold that admitting the tape recording did not violate defendant's right to confrontation.[10]

Because we have held that admitting the tape did not violate defendant's fourth amendment rights, that a proper foundation was established for admitting the tape into evidence, and that admitting the tape did not violate defendant's right to confrontation, we conclude that the tape was properly admitted.

### VALIDITY OF CONVICTION AND DEATH PENALTY UPON ALLEGATION OF MENTAL STATE OF KNOWINGLY

Defendant argues that the trial court erred when it allowed the prosecution to obtain a conviction and the death penalty upon an allegation in count I of only the culpable mental state of knowingly. He contends that although premeditated murder historically has been a specific intent crime, allowing a conviction for the less culpable mental state of knowingly would make it a general intent crime in Arizona. Furthermore, defendant argues, the prosecution charged knowingly rather than intentionally so the trial would not be "muddied up" with evidence of defendant's intoxication. He also questions the constitutionality of imposing the death penalty for a "non-intentional" murder.[11] We reject each of these arguments.

■ In Arizona, a person commits first degree murder if *"[i]ntending or knowing* that his conduct will cause death, such person causes the death of another with premeditation." A.R.S. § 13–1105(A)(1) (emphasis added). A person acts with premeditation if he "acts with either *the intention*

*or the knowledge* that he will kill another human being, when such *intention or knowledge* precedes the killing by a length of time to permit reflection." A.R.S. § 13–1101(1) (emphasis added). Because the plain language of these statutes defining first degree murder is in the disjunctive, first degree murder may be based on either intentional or knowing conduct. Thus, the State need not allege that defendant acted "intentionally" or "intentionally or knowingly"; an allegation that defendant acted "knowingly" is sufficient under Arizona's first degree murder statutes.

■ We believe the State's reasons for charging a knowing mental state rather than an intentional mental state are irrelevant because, as we have just determined, the first degree murder statutes clearly provide that a person may be convicted for either intentional or knowing conduct. Even if the State charged knowingly rather than intentionally to preclude the introduction of evidence of defendant's intoxication, we find such a legal strategy acceptable. In fact, we implicitly approved this conduct in *State v. Rankovich*, where we stated that "[i]f an accused is charged with knowingly committing first-degree murder, the accused is not entitled to a voluntary intoxication instruction." 159 Ariz. 116, 122, 765 P.2d 518, 524 (1988) (citation omitted).

■ We answer in the affirmative defendant's question as to whether the death penalty constitutionally may be imposed upon a person who "only" knowingly commits murder. The United States Supreme Court has held that "an intent to kill" is *not* a constitutional prerequisite to imposing capital punishment. *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 1688, 95 L.Ed.2d 127 (1987); *State v. McCall*, 160 Ariz. 119, 126, 770 P.2d 1165, 1172 (1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990). In *Tison*, the Court held "that major participation in the

---

10. Once again, the Washington case that featured the tape recording of a murder is consistent with our conclusion. *See Smith*, 85 Wash.2d at 849–50, 540 P.2d at 430.

11. Defendant also argues that charging only knowingly in count I and knowingly or intentionally in count II left the jury hopelessly confused. Because we find this argument to have no merit, we need not address it any further.

felony committed, combined with reckless indifference to human life, is sufficient to satisfy the *Enmund*[12] culpability requirement." *Tison*, 481 U.S. at 158, 107 S.Ct. at 1688 (footnote omitted). Since *Tison*, this court has rejected an argument that a death sentence based on a knowing *mens rea* violates the *Enmund* culpability requirement. In *State v. McCall*, we rejected this argument because *McCall* was "not a felony murder case as were *Enmund* and *Tison*. This defendant was charged with and convicted of premeditated murder.... The jury findings alone are a sufficient basis for death-qualifying the defendant under *Enmund*." 160 Ariz. at 126, 770 P.2d at 1172. We concluded that "even under the *Tison* felony murder standard, defendant could constitutionally be sentenced to death because his convictions demonstrate both a reckless disregard for human life and major participation in the crimes leading to the deaths." *Id.* We find *Tison* and *McCall* dispositive, and therefore reject defendant's constitutional challenge to the imposition of the death penalty for knowingly causing the death of another person.

## TRIAL COURT'S REFUSAL TO EXCUSE A JUROR

■ Defendant argues that the trial court abused its discretion when it denied the defense request to excuse, for cause, a prospective juror who eventually served on the jury that convicted defendant. According to defendant, Juror Ebel indicated his desire to be a good juror, but candidly acknowledged that news reports he had seen would "haunt [his] memory in this case." Defendant argues that the "haunting" of Mr. Ebel's memory is no less substantial than the "weighing on my mind" that led the trial court to strike a juror for cause in *State v. Sparks*, 147 Ariz. 51, 708 P.2d 732 (1985).

■ We do not believe the trial court committed reversible error when it refused to strike Juror Ebel. Under our Rules of Criminal Procedure, the trial court shall excuse a juror for cause "[w]hen there is

reasonable ground to believe that a juror cannot render a fair and impartial verdict." Ariz.R.Crim.P. 18.4(b), 17 A.R.S. The decision as to whether a juror can render a fair and impartial verdict is for the trial court. *State v. Chaney*, 141 Ariz. 295, 303, 686 P.2d 1265, 1273 (1984) (citing *State v. Rose*, 121 Ariz. 131, 139, 589 P.2d 5, 13 (1978)). Because the trial court has the opportunity to observe the potential juror's demeanor and credibility, we will not set aside the trial court's ruling on a challenge to a juror absent a clear showing that the. court abused its discretion. *E.g., Sparks*, 147 Ariz. at 54, 708 P.2d at 735; *Chaney*, 141 Ariz. at 303, 686 P.2d at 1273. "Moreover, the party asserting that the trial court erred in denying a motion to strike a juror for cause has the burden of establishing that the juror is incapable of rendering a fair and impartial verdict." *State v. Davis*, 137 Ariz. 551, 559, 672 P.2d 480, 488 (App. 1983) (citing *State v. Munson*, 129 Ariz. 441, 631 P.2d 1099 (App.1981); *State v. Rose*, 121 Ariz. 131, 589 P.2d 5 (1978)).

In this case, Juror Ebel informed the trial court that he had heard a television report about the case and knew of the existence of the tape recording. Although he acknowledged that the news report "would kind of haunt [his] memory," he stated that he felt he could decide the case based solely upon the evidence admitted at trial, even if the tape recording was not admitted. The trial court found that Juror Ebel could be fair and impartial whether or not the tape recording was admitted at trial. We find no abuse of discretion on these facts. *State v. Rhodes*, 112 Ariz. 500, 509, 543 P.2d 1129, 1138 (1975) ("Where jurors upon being questioned admit they have read and remembered an article pertaining to the case but state that they have not formed an opinion as to guilt or innocence of the defendant, it has been held that a failure to strike such jurors for cause is not an abuse of the court's discretion.") (citation omitted); *State v. Sexton*, 163 Ariz. 301, 302–03, 787 P.2d 1097, 1098–99 (App.1989) ("When a potential juror's answers demonstrate serious misgivings

12. *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

about the ability to be fair and impartial, that juror should be struck for cause. If a potential juror ultimately assures the trial judge that she can be fair, it is not error to refuse to strike her.") (citations omitted); *cf. State v. Tison*, 129 Ariz. 526, 533, 633 P.2d 335, 342 (1981) ("The fact ... that a prospective juror possesses an opinion or belief regarding the guilt of the defendant does not mean that the juror would be influenced by that belief and could not render a fair and impartial verdict.... Without a showing of unqualified partiality of the juror, we will not upset a determination so clearly within the province of the court.") (citations omitted), *cert. denied*, 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982).

The case defendant cites, *Sparks*, is not to the contrary. In *Sparks*, the trial court excused a veniremember, Miss Earnshaw, after she told the court that the·fact that the defendant was a teenager "would be weighing on my mind," and that her beliefs with respect to capital punishment might cause her a problem. 147 Ariz. at 55, 708 P.2d at 736. *Sparks*, however, does not support defendant's argument. It merely held that the trial court did not abuse its discretion in excusing Earnshaw; it did not hold that a refusal to excuse Earnshaw under the circumstances would have constituted an abuse of discretion.[13] *See id.* Moreover, in *Sparks* we noted our belief that "Earnshaw's statements, read as a whole, indicated her inability to sit as a juror without distraction." *Id.* In this case, on the other hand, we believe that Juror Ebel's statements, read as a whole,

do not indicate an inability to serve as a fair and impartial juror. Thus, we conclude that the trial court did not err by refusing to strike Juror Ebel.

### DEATH SENTENCES

 In all death cases, this court independently examines the record and determines the existence or non-existence of both aggravating and mitigating circumstances. *E.g., State v. McMurtrey*, 151 Ariz. 105, 108, 726 P.2d 202, 205 (1986), *cert. denied*, 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 530 (1987). Additionally, we independently determine the weight given each such circumstance and whether the mitigating circumstances are sufficient to outweigh the aggravating circumstances. *See, e.g., State v. Nash*, 143 Ariz. 392, 404, 694 P.2d 222, 234, *cert. denied*, 471 U.S. 1143, 105 S.Ct. 2689, 86 L.Ed.2d 706 (1985). Finally, as part of our independent review, we conduct a proportionality review to determine whether the death sentences "are excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." *E.g., State v. Walton*, 159 Ariz. 571, 589, 769 P.2d 1017, 1035 (1989) (citations omitted), *aff'd*, —— U.S. ——, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).[14]

#### A. Independent Review of Aggravating Circumstances

#### 1. Cruelty in the Murder of Jennifer

 The trial court found that Jennifer's murder was committed in an espe-

---

**13.** In fact, with regard to another juror in *Sparks*, Miss Stump, we specifically held that the trial court did not abuse its discretion in failing to strike the juror. *Id.* at 54, 708 P.2d at 735. We noted that although Ms. Stump's "replies as to her ability to sit as a juror exposed a degree of ambivalence," she could serve if "willing to put aside her opinions and base her decision solely upon the evidence." *Id.* (citing *State v. Clabourne*, 142 Ariz. 335, 344, 690 P.2d 54, 63 (1984)). We also noted that "[t]he voir dire was properly used to rehabilitate her by persuading her of her responsibility to sit impartially." *Id.; see also State v. Poland*, 144 Ariz. 388, 398, 698 P.2d 183, 193 (1985), *aff'd*, 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986).

The facts of this case are much like the facts in *Sparks* regarding Stump. Although Juror Ebel's replies as to his ability to serve as a juror exposed a degree of ambivalence, he stated that he thought he could put aside what he had heard and decide the case based upon the evidence in the courtroom. The voir dire was properly used to rehabilitate him by persuading him of his responsibility to sit impartially and give defendant a fair trial based on the evidence in the courtroom.

**14.** In *Walton*, the Supreme Court stated that "proportionality review is not constitutionally required." —— U.S. at ——, 110 S.Ct. at 3058. We continue to conduct proportionality reviews as a matter of Arizona law.

cially cruel manner. Defendant argues that Jennifer "died from a single stab wound efficiently administered by [defendant] who immediately departed the scene without any effort or attempt to prolong her expiration by preventing or deterring help or aid from others." He contends that Jennifer's suffering was directly related to the "inefficiency and primitiveness" of the murder weapon utilized, and that the death penalty should be reserved for those cases in which the murderer purposely selected the murder method in order to accomplish something beyond the simple taking of the victim's life. Citing *State v. Tuttle,* 780 P.2d 1203 (Utah 1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1323, 108 L.Ed.2d 498 (1990), he argues that although a stabbing is gory and distasteful, there is no evidence that defendant had a quicker or less painful method available to him or that he intentionally refrained from inflicting a different wound that would have killed Jennifer instantaneously.

An aggravating circumstance is established if the defendant committed the murder "in an especially heinous, cruel or depraved manner." A.R.S. § 13–703(F)(6). A murder is committed in an especially cruel manner if the defendant inflicts mental anguish or physical abuse before the victim dies. *State v. Amaya–Ruiz,* 166 Ariz. 152, 177, 800 P.2d 1260, 1285 (1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2044, 114 L.Ed.2d 129 (1991); *Walton,* 159 Ariz. at 586, 769 P.2d at 1032. Mental anguish includes the victim's uncertainty as to her ultimate fate. *Walton,* 159 Ariz. at 586, 769 P.2d at 1032; *State v. McCall,* 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984). We have found cruelty in the great mental pain suffered by victims who were forced to witness the killing of other family members before being killed themselves. *State v. Smith,* 146 Ariz. 491 at 504, 707 P.2d 289 at 302 (1985); *State v. Tison,* 129 Ariz. 526, 543, 633 P.2d 335, 352 (1981), *cert. denied,* 459 U.S. 882, 103 S.Ct. 180, 74 L.Ed.2d 147 (1982); *see also McCall,* 139 Ariz. at 161, 677 P.2d at 934.

We find that the murder was especially cruel because of the mental anguish Jennifer suffered before the fatal stab wound to her chest. The record indicates not only that Jennifer was uncertain as to her fate, but also that she saw defendant stab a loved one, her mother. After defendant asked, "[t]hink I'd hurt you," Jennifer twice stated, "[j]ust put the knife away and we won't think you will hurt us any more." This alone indicates that Jennifer was uncertain as to her fate. After Jennifer said something else to defendant, he evidently cut her on the left wrist with the knife. As Jennifer cried and screamed, defendant stabbed her mother in the back. Finally, Jennifer ran out of the apartment and down the stairs and pounded on a neighbor's door before defendant stabbed her in the chest. Thus, we conclude that Jennifer's murder was especially cruel because she suffered mental anguish before the fatal stab wound was inflicted.

We also reject defendant's argument that Jennifer's suffering was directly related to the "inefficiency and primitiveness" of the murder weapon used. As a factual matter, this argument is not entirely correct. Although the physical suffering may have been related to the weapon used, we have concluded that the murder was especially cruel because of the mental anguish that Jennifer suffered. This mental anguish is not related to the weapon used. In fact, we have already rejected a similar argument in *State v. Gillies,* 142 Ariz. 564, 691 P.2d 655 (1984), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1775, 84 L.Ed.2d 834 (1985). In *Gillies,* the appellant argued that he was sentenced to death merely because he killed the victim in a crude manner, namely by pushing her off a forty-foot embankment and then beating her to death with a rock. *Id.* 142 Ariz. at 569–70, 691 P.2d at 660–61. We concluded that "[i]t was not only the manner of death, but also the circumstances surrounding it and their effect on the victim that amply warrant the finding of cruelty." *Id.* at 570, 691 P.2d at 661.

For the above reasons, we conclude that Jennifer's murder was committed in an especially cruel manner, and that the trial

court's finding of aggravation under A.R.S. § 13–703(F)(6) was therefore proper.

### 2. Cruelty in the Murder of Mary

■■■■ The trial court found that Mary's murder was committed in an especially cruel manner. Defendant concedes, as he must based on this record, that Mary suffered after she was stabbed. He argues, however, that Mary's murder should not be considered especially cruel because Mary was suffering greatly from the stab wound and defendant's last act of shooting her in the head "could well be argued to be an act of mercy by a devoted loved one come to his senses."

We reject defendant's argument for two reasons. First, as a factual matter, the record does not support it. Defendant testified at the presentence hearing that he shot Mary after he thought she was dead and that he did not know why he shot her. Thus, defendant's own testimony counters the argument that shooting Mary was merciful. Shooting a person thought to be dead cannot be considered an "act of mercy."

■■■■ Second, even if we assume that defendant thought Mary was still alive when he shot her, and even if we assume that defendant shot her to relieve her suffering from the stab wound he had previously inflicted, we nonetheless believe the murder was especially cruel. In determining whether a murder was committed in an especially cruel manner, we must examine the entire murder transaction and not simply the final act that killed the victim. *See Gillies*, 142 Ariz. at 570, 691 P.2d at 661 (rejecting an argument that we may not consider events before the murder on the issue of cruelty, and noting that "[w]e feel it essential to inquire into the totality of circumstances surrounding the murder to determine whether aggravating factors ex-

ist"); *State v. Ceja*, 126 Ariz. 35, 39–40, 612 P.2d 491, 495–96 (1980) (rejecting a request to examine each part of the killings as separate and apart, and noting that "it is in the totality of the circumstances" of the killings that we find the killings to be heinous and depraved). Applying this principle, we conclude that Mary's physical and emotional suffering that resulted from the stabbing is more than sufficient to establish that defendant committed the murder in an especially cruel manner.

Thus, we conclude that the trial court's finding of aggravation under A.R.S. § 13–703(F)(6) was proper.[15]

### 3. Murders Committed During the Commission of Each Other

■■ A.R.S. § 13–703(F)(8) specifies as an aggravating circumstance the fact that "[t]he defendant has been convicted of one or more other homicides ... which were committed during the commission of the offense." In this case, the trial court found that this aggravating circumstance applied to both Jennifer's murder and Mary's murder. Defendant argues, however, that because of the three hour time differential and the difference in location of the murders, they were not "committed during the commission" of each other. We disagree.

In determining whether the evidence supports a finding that a murder was committed during the commission of another murder, we should analyze "the temporal, spatial, and motivational relationships between the capital homicide and the collateral [homicide], as well as ... the nature of that [homicide] and the identity of its victim." Annotation, *Sufficiency of Evidence, for Death Penalty Purposes, To Establish Statutory Aggravating Circumstance That Murder Was Committed in Course of Committing, Attempting, Or Fleeing*

---

**15.** We note that even if we found the murder not to be especially cruel, the trial court's finding of aggravation under A.R.S. § 13–703(F)(6) was still proper. The trial court also found that Mary's murder was heinous and depraved. Defendant has not challenged this finding on appeal, and we have independently concluded that it is supported by the record. Thus, defendant

has in effect conceded that the § 13–703(F)(6) finding was proper because we have long held that the statutory expression of "especially heinous, cruel or depraved" is stated in the disjunctive, and that a finding of any one of those factors is therefore sufficient to constitute an aggravating circumstance. *See, e.g., Walton,* 159 Ariz. at 587, 769 P.2d at 1033.

*From Other Offense, and the Like—Post–Gregg Cases,* 67 A.L.R.4th 887, 892, 894 (1989); *see Romine v. State,* 251 Ga. 208, 213–14, 305 S.E.2d 93, 99 (1983) (first murder committed during course of second murder when murders "were committed by appellant in a relatively short period of time in what can be fairly viewed as one continuous course of criminal conduct"), *cert. denied,* 481 U.S. 1024, 107 S.Ct. 1912, 95 L.Ed.2d 517 (1987); *cf. State v. Henry,* 152 Ariz. 608, 612, 734 P.2d 93, 97 (1987) ("different crimes committed in 'spatio-temporal proximity' and forming part of the same criminal episode against the same victim or group of victims are crimes committed on the 'same occasion'" for purposes of sentencing under A.R.S. § 13–604); *State v. Ortiz,* 131 Ariz. 195, 209–10, 639 P.2d ·1020, 1034–35 (1981) (death of murder victim does not terminate the "commission of the offense" within the meaning of A.R.S. § 13–703(F)(3)), *cert. denied,* 456 U.S. 984, 102 S.Ct. 2259, 72 L.Ed.2d 863 (1982). In doing so, " 'we will not hold a stopwatch on the events' of the murder 'to avoid the clear intent of the legislature in enacting' A.R.S. § 13–703(F)." *Ortiz,* 131 Ariz. at 210, 639 P.2d at 1035 (citation omitted).

Applying this principle, we find that defendant committed the murder of Jennifer during the murder of Mary, and that defendant committed the murder of Mary during the murder of Jennifer. As defendant concedes, Mary was stabbed shortly after 1:00 a.m. Thus, the murder of Mary arguably began at this time and not at 4:37 a.m. when Mary was shot. *See supra* p. 350 ("we must examine the entire murder transaction and not simply the final act that killed the victim"). If Mary's murder began shortly after 1:00 a.m., the two murders were separated by just minutes. Even if we assume that Mary's murder was committed at 4:37 a.m. when she was shot, the record reveals that Jennifer's murder was committed only about three hours earlier. Both murders were committed in approximately the same place; Mary was killed in the bedroom of the second-story apartment and Jennifer was chased out of that apartment and killed in front of the

first-story apartment immediately below the one in which Mary was killed. A domestic dispute appears to be the motivation for these two murders of related victims, and both murders were a part of a continuous course of criminal conduct. Thus, we conclude that the murders of Jennifer and Mary were each "committed during the commission" of the other, and that the trial court's finding of aggravation under A.R.S. § 13–703(F)(8) was proper as to both counts.

## B. *Independent Review of Mitigating Circumstances*

■ Defendant raises several arguments regarding the mitigating circumstances found by the trial court. First, he argues that the trial court improperly discounted the mitigating circumstance of mental impairment and intoxication by stating that it was incongruous that the cause of the murder can also require leniency. We disagree. Although we agree with defendant that it is not incongruous that a mental disorder that causes a murder can also require leniency, *see, e.g., State v. Brookover,* 124 Ariz. 38, 42, 601 P.2d 1322, 1326 (1979) (holding that leniency is required when defendant's neurological lesion was "a major and contributing cause of his conduct"); *State v. Doss,* 116 Ariz. 156, 163, 568 P.2d 1054, 1061 (1977) (holding that leniency is appropriate when defendant's mental condition was "a substantial factor" in causing the murder), we find no evidence in the record that by making this statement the trial court improperly discounted the mitigating circumstance.

■ The trial court was not able to determine the extent to which the defendant's ability to appreciate the wrongfulness of his conduct was impaired, but nonetheless found that "it was impaired to some extent and this is a mitigating circumstance." Defendant has the burden of proving the existence of mitigating circumstances by a preponderance of the evidence, and the court may take notice of evidence that tends to refute a proffered mitigating circumstance. *State v. Poland,* 144 Ariz. 412, 415, 698 P.2d 207, 210 (1985)

(citations omitted), *aff'd,* 476 U.S. 147, 106 S.Ct. 1749, 90 L.Ed.2d 123 (1986); *see* A.R.S. § 13–703(C). In light of the conflicting evidence regarding defendant's mental impairment at the time of the offense,[16] the trial court would have been justified in finding that mental impairment was not a mitigating circumstance at all. *See id.* Thus, we conclude that the trial court, which found defendant's impairment to be a mitigating circumstance, did not improperly discount that impairment.

■ For the same reasons, we also conclude that the trial court did not improperly discount defendant's impairment by reason of intoxication. "The fact that a defendant was to some degree intoxicated is not, by itself, a mitigating circumstance." *McMurtrey,* 151 Ariz. at 110, 726 P.2d at 207 (quoting *State v. Woratzeck,* 134 Ariz. 452, 458, 657 P.2d 865, 871 (1982)). Whether a defendant's intoxication is sufficient to constitute a mitigating circumstance "depends upon whether his capacity to appreciate the wrongfulness of his conduct or to conform his conduct to requirements of law was significantly impaired." *Woratzeck,* 134 Ariz. at 458, 657 P.2d at 871; *see* A.R.S. § 13–703(G)(1). Because the evidence as to defendant's intoxication was conflicting, the trial court would have been justified in finding that it did not constitute a mitigating circumstance. *See McMurtrey,* 151 Ariz. at 110, 726 P.2d at 207 (citing *State v. Jeffers,* 135 Ariz. 404, 661 P.2d 1105, *cert. denied,* 464 U.S. 865, 104 S.Ct. 199, 78 L.Ed.2d 174 (1983); *Woratzeck,* 134 Ariz. at 458, 657 P.2d at 871). Thus, we conclude that the trial court, which found defendant's impairment by intoxication to be a mitigating circumstance,

did not improperly discount defendant's intoxication at the time of the murders.

■ Defendant's second mitigation argument is that the trial court improperly discounted the mitigating circumstance of lack of a prior criminal or felony record by considering his two prior arrests involving domestic violence situations. We disagree. A.R.S. § 13–703(C) provides, *inter alia,* that "[t]he prosecution and the defendant shall be permitted to rebut any information received at the [aggravation/mitigation] hearing and shall be given fair opportunity to present argument...." In *State v. Ortiz,* the State introduced a transcript of the defendant's wife's testimony to rebut his mitigation testimony that he was of good character, had been a good father, and had no prior criminal record. 131 Ariz. at 208, 639 P.2d at 1033. The transcript revealed that the defendant had beaten his wife a dozen times, pointed a gun at her, and had an affair. Relying on § 13–703(C), we held that "any relevant evidence may be used to rebut the defendant's mitigating circumstances regardless of its admissibility at trial." *Id.* We now hold that defendant's two prior arrests for domestic violence, even though they did not result in convictions, are relevant and may be considered to rebut defendant's proffered mitigating circumstance that he had no prior criminal record. Thus, we conclude that the trial court did not err when it considered these arrests in evaluating the weight to give to defendant's lack of prior felony convictions.

■ Defendant's third mitigation argument is that the trial court improperly discounted evidence of his good conduct while in jail and testimony that he would be a model prisoner by referring to legal disagreements with trial counsel and unsup-

---

16. *See supra* pp. 339–340. We note that under similar facts, we have determined that the trial court was not compelled to accept the opinion of a defense expert. For example, in *State v. Greenawalt,* we stated that

the lower court was not compelled to accept Dr. Melendez' psychiatric opinion of the mental condition of Greenawalt in the light of the unproven nature of the theory relied upon by Dr. Melendez for his diagnosis and the unsatisfactory explanation of certain events in Greenawalt's life which, in combination, did

not adequately substantiate his claim of impaired capacity....

128 Ariz. 150, 172–73, 624 P.2d 828, 850–51 (citations omitted), *cert. denied,* 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); *see also State v. Wallace,* 160 Ariz. 424, 426, 773 P.2d 983, 985 (1989) (court not compelled to accept opinion of defense expert where other psychiatric testimony contradicted that opinion and the defendant himself contradicted the expert's factual testimony), *cert. denied,* —— U.S. ——, 110 S.Ct. 1513, 108 L.Ed.2d 649 (1990).

ported requests of the court. We disagree. Our review of the record indicates that the trial court refused to find defendant's conduct during trial to be a separate mitigating circumstance. The record does not indicate that the trial court used defendant's conduct during trial to discount the mitigating circumstance of good conduct while incarcerated.

## C. *Weighing of Aggravating and Mitigating Circumstances*

■ Defendant contends that the mitigating circumstances, if properly evaluated, are sufficiently substantial to call for leniency and life sentences on both counts. We have independently considered both the aggravating and the mitigating circumstances. We agree with the trial court that three aggravating circumstances exist for count I, the murder of Jennifer: (1) defendant was an adult at the time of the murder and Jennifer was under fifteen years of age, A.R.S. § 13–703(F)(9); (2) defendant was convicted of another homicide committed during the commission of the offense, § 13–703(F)(8); and (3) the murder was committed in an especially cruel manner, § 13–703(F)(6). We also agree that two aggravating circumstances exist for count II, the murder of Mary: (1) defendant was convicted of another homicide committed during the commission of the offense, § 13–703(F)(8); and (2) the murder was committed in an especially heinous, cruel, and depraved manner, § 13–703(F)(6). We also accept the trial court's finding of four mitigating circumstances that apply to both counts: (1) defendant's ability to appreciate the wrongfulness of his conduct was impaired to some extent, § 13–703(G)(1); (2) defendant's lack of any prior felony convictions; (3) defendant's good military and employment record; and (4) defendant's good conduct while incarcerated. As we are required to do, we have carefully weighed the aggravating and mitigating circumstances and have concluded that, given the seriousness of the crime, the mitigating circumstances are not sufficiently substantial to call for leniency. *See* § 13–703(E).

## D. *Proportionality Review*

■ We have conducted a proportionality review to determine whether the death sentences in this case are excessive or disproportionate to the penalty imposed in similar cases. In doing so, we have considered cases in which the trial court sentenced the defendant to death based upon a finding of two or more aggravating factors and no mitigating circumstances sufficiently substantial to require leniency. *E.g., Walton*, 159 Ariz. 571, 769 P.2d 1017; *State v. Martinez–Villareal*, 145 Ariz. 441, 702 P.2d 670, *cert. denied*, 474 U.S. 975, 106 S.Ct. 339, 88 L.Ed.2d 324 (1985); *State v. Fisher*, 141 Ariz. 227, 686 P.2d 750, *cert. denied*, 469 U.S. 1066, 105 S.Ct. 548, 83 L.Ed.2d 436 (1984); *State v. James*, 141 Ariz. 141, 685 P.2d 1293, *cert. denied*, 469 U.S. 990, 105 S.Ct. 398, 83 L.Ed.2d 332 (1984); *State v. Libberton*, 141 Ariz. 132, 685 P.2d 1284 (1984). Additionally, we have reviewed one recent case that involved the same three aggravating factors found to exist in this case for count I. *State v. Stanley*, 167 Ariz. 519, 809 P.2d 944 (1991). Finally, we have reviewed cases in which this court reduced the sentence imposed to life imprisonment. *E.g., State v. Mauro*, 159 Ariz. 186, 766 P.2d 59 (1988); *State v. Graham*, 135 Ariz. 209, 660 P.2d 460 (1983); *State v. Watson*, 129 Ariz. 60, 628 P.2d 943 (1981); *State v. Lujan*, 124 Ariz. 365, 604 P.2d 629 (1979); *Brookover*, 124 Ariz. 38, 601 P.2d 1322.

Based upon our review of these cases, we find that the death sentences imposed in this case are proportional to the sentences imposed in similar cases.

## E. *Prosecutor's Decision To Seek the Death Penalty*

■ Defendant argues "that a prosecutor abdicates his governmental responsibility and denies all murder defendants due process of law by making the wishes of the surviving relatives the deciding factor in the prosecutor's decision to seek the death penalty in any case." Defendant did not raise this argument in the trial court, and has therefore waived it absent fundamental error. *See, e.g., State v. Thomas*, 130 Ariz.

432, 435, 636 P.2d 1214, 1217 (1981). This conclusion is not altered by the fact that defendant did argue at trial that the lack of legislatively enacted guidelines to channel prosecutors' discretion violates the eighth amendment. *See State v. Neal,* 143 Ariz. 93, 100, 692 P.2d 272, 279 (1984) ("if evidence is objected to on one ground in the trial court and admitted over that objection, other grounds raised for the first time on appeal are waived") (citation omitted); *State v. Christensen,* 129 Ariz. 32, 37, 628 P.2d 580, 585 (1981) (appellant waives error by "assigning grounds for objection not raised below") (citation omitted).

Because defendant failed to raise this argument in the trial court, we must determine whether it is fundamental error for the prosecutor to consider the wishes of the victim's family in determining whether to seek the death penalty. Before we may engage in a fundamental error analysis, however, we must first find that the trial court committed some error. *See Thomas,* 130 Ariz. at 436, 636 P.2d at 1218; *State v. King,* 158 Ariz. 419, 424, 763 P.2d 239, 244 (1988). For the reasons stated below, we find no such error in refusing to sentence defendant to a sentence other than death.

■ First, we note that the record does not support defendant's argument that the family's wishes were "the deciding factor" in the State's decision to seek the death penalty. K.C. Scull, head of the Major Felony Bureau of the Maricopa County Attorney's Office, testified that the family supported the decision to seek the death penalty in this case. He also testified, however, that many factors are considered in determining whether to seek the death penalty. Although the decision is made on a case-by-case basis, some of the factors that may be considered include: (1) the aggravating circumstances in A.R.S. § 13–703, (2) the family's feelings regard-

ing the decision to seek the death penalty, (3) the facts involved, (4) the defendant's character and mitigating factors, (5) the strength of the evidence, and (6) who the trial judge is. We have reviewed the record and find nothing in it that indicates the State placed any undue weight on the family's wishes. Thus, we conclude that although the family's wishes may have been *a factor* in the decision to seek the death penalty, they were *not the deciding factor.*[17]

■ Second, we reject defendant's argument that *Booth v. Maryland* makes it unconstitutional for a prosecutor to consider the wishes of the victim's family in deciding whether to seek the death penalty. *See* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). In *Booth,* the United States Supreme Court held that "the introduction of a VIS [victim impact statement] *at the sentencing phase* of a capital murder trial violates the Eighth Amendment," *id.* at 509, 107 S.Ct. at 2536 (emphasis added), because a VIS "is irrelevant to a capital sentencing decision, and ... its admission creates a constitutionally unacceptable risk that the *jury* may *impose* the death penalty in an arbitrary and capricious manner," *id.* at 502–03, 107 S.Ct. at 2533 (emphasis added). The Court noted that "the degree to which a family is willing and able to express its grief is irrelevant to the decision whether a defendant, who may merit the death penalty, may live or die." *Id.* at 505, 107 S.Ct. at 2534.

In this case, the family's wishes influenced a *pre-trial* decision by the *State* to *seek* the death penalty; they did not influence the sentencing body's decision to impose the death penalty. Thus, we hold that *Booth* does not prohibit the State from considering the wishes of the victim's family in deciding whether to seek the death

---

**17.** Defendant cites *State v. McDonnell* for the proposition that it is error to permit the victim's family's wishes to be the controlling factor in the State's decision whether to seek the death penalty. *See* 310 Or. 98, 794 P.2d 780 (1990). Because we have determined that the family's wishes in this case were a factor but not the controlling or deciding factor, we do not find *McDonnell* persuasive. We also note that the

court in *McDonnell* based its decision on Oregon statutes controlling when a district attorney may negotiate a plea. The court noted that "[b]ecause our decision in this case is dictated by the statutes that govern a district attorney's authority to plea bargain, it is unnecessary for this court to reach defendant's state and federal constitutional claims." *Id.* at 107 n. 8, 794 P.2d at 785 n. 8.

penalty.[18] *McKenzie v. Risley*, 842 F.2d 1525, 1537–38 n. 25 (9th Cir.) (en banc), *cert. denied*, 488 U.S. 901, 109 S.Ct. 250, 102 L.Ed.2d 239 (1988).

Third, we note that prosecutors traditionally have had great discretion in determining what crimes to charge and what penalties to seek. For example, the United States Supreme Court has stated that "the policy considerations behind a prosecutor's traditionally 'wide discretion' suggest the impropriety of our requiring prosecutors to defend their decisions to seek death penalties. . . ." *McCleskey v. Kemp*, 481 U.S. 279, 296, 107 S.Ct. 1756, 1769, 95 L.Ed.2d 262 (1987). Moreover, a defendant "cannot prove a constitutional violation by demonstrating that other defendants who may be similarly situated did *not* receive the death penalty" because of prosecutorial discretion. *Id.* at 306–07, 107 S.Ct. at 1775; *Gregg v. Georgia*, 428 U.S. 153, 199, 96 S.Ct. 2909, 2937, 49 L.Ed.2d 859 (1976) (plurality opinion); *see State v. Harding*, 137 Ariz. 278, 292, 670 P.2d 383, 397 (1983), *cert. denied*, 465 U.S. 1013, 104 S.Ct. 1017, 79 L.Ed.2d 246 (1984); *State v. Richmond*, 114 Ariz. 186, 195, 560 P.2d 41, 50 (1976), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1101 (1977).

Fourth, we have found several cases that specifically considered whether it is constitutional for the State to consider the wishes of the victim's family in deciding whether to seek the death penalty. These cases all held that it is constitutional. *McKenzie*, 842 F.2d at 1536, 1537–38 n. 25 (finding no impropriety in state's refusal to go through with a proposed plea bargain when the contingency of obtaining the approval of the victim's family was not satisfied); *Townsend v. State*, 533 N.E.2d 1215, 1222 (Ind.1989) (concluding that considering the feelings of the victim's family, among other things, does not make the decision to seek the death penalty arbitrary), *cert. denied*, —— U.S. ——, 110 S.Ct. 1327, 108 L.Ed.2d 502 and *cert. denied*, —— U.S. ——, 110 S.Ct. 2633, 110 L.Ed.2d 653 (1990); *Huffington v. State*, 304 Md. 559, 582–84, 500 A.2d 272, 284–85 (1985) (concluding that consulting with the victim's family after the State had already decided to seek the death penalty does not make the decision arbitrary), *cert. denied*, 478 U.S. 1023, 106 S.Ct. 3315, 92 L.Ed.2d 745 (1986); *State v. Wilson*, 311 N.C. 117, 123, 316 S.E.2d 46, 51 (1984) (rejecting defendant's due process and equal protection challenge and finding nothing impermissible about the district attorney's consideration of the wishes of the family as one factor in determining which defendants will be prosecuted for first degree murder and thereby subjected to the death penalty).

For the reasons stated above, we hold that the wishes of the victim's family may be a factor in the State's decision whether to seek the death penalty. Thus, the trial court did not err by refusing to sentence defendant to a sentence other than death.

## RESTITUTION

The trial court ordered that defendant pay $18,797.60 in restitution to Jan

---

**18.** We note that since the briefing and oral argument of this case, the United States Supreme Court overruled *Booth's* holding that the eighth amendment prohibits the admission of victim impact evidence during the sentencing phase of a capital trial. *Payne v. Tennessee*, —— U.S. ——, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). The Court held "that if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." *Id.* at ——, 111 S.Ct. at 2609.

The Court, however, limited its holding to overruling *Booth's* rule "that evidence and argument relating to the victim and the impact of the victim's death on the victim's family are inadmissible at a capital sentencing hearing."

*Id.* at —— n. 2, 111 S.Ct. at 2611 n. 2. It did not consider the holding in *Booth* "that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment" because no such evidence was presented in *Payne*. *Id.; see also id.* at —— n. 2, 111 S.Ct. at 2611 n. 2 (Souter, J., concurring). Because the Court has not yet overruled that part of *Booth* that prohibits admitting at sentencing the family's opinions as to the appropriate sentence, we have considered defendant's argument that *Booth* prohibits a prosecutor from considering the family's wishes in deciding whether to seek the death penalty. However, as indicated above in the text, we find *Booth* distinguishable and therefore reject this argument.

Vonderheide, Mary's sister, to cover the funeral expenses incurred as a result of the murders of Mary and Jennifer. Although defendant acknowledges "the inadequacy of the record currently before this Court as to the particulars of this issue," he requests that we remand the matter to the trial court for an evidentiary hearing with directions that the restitution be reduced or credited with any payments Jan Vonderheide has received from life insurance policies that defendant paid for and provided to Mary and Jennifer.

Although defendant claims that he provided life insurance to Mary and Jennifer, the record contains nothing that establishes the existence of any such life insurance policies, the amount of the proceeds paid out under any such policies, or that Jan Vonderheide received any such proceeds. Defendant has the duty to ensure that the record contains any material or documents necessary to his argument on appeal. When the record is not complete, we must assume that any evidence not available on appeal supports the trial court's actions. *State v. Crum,* 150 Ariz. 244, 247, 722 P.2d 971, 974 (App.1986) (court rejected argument that affidavit providing basis for search warrant was defective because the affidavit was never admitted into evidence); *State v. Kerr,* 142 Ariz. 426, 430, 690 P.2d 145, 149 (App.1984) (court rejected argument that motion to suppress should have been granted because counsel for the defense never introduced the warrant and attached list into evidence); *see State v. Zuck,* 134 Ariz. 509, 512–13, 658 P.2d 162, 165–66 (1982). Thus, by failing to ensure that the record on appeal is sufficient to support his argument, defendant has waived review of the restitution issue.

## DISPOSITION

We have searched the entire record for fundamental error as required by A.R.S. § 13–4035, *Anders v. California,* 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967), and *State v. Leon,* 104 Ariz. 297, 451 P.2d 878 (1969), and have found none. We af-

firm defendant's convictions and death sentences.

FELDMAN, V.C.J., and CAMERON, J., concur.

MOELLER, Justice, specially concurring in part.

I concur in all portions of the majority's opinion except that portion entitled "D. Proportionality Review" which, in my view, is unnecessary. *See* the concurring opinions of Justices Corcoran and Moeller in *State v. White,* 168 Ariz. 500, 815 P.2d 869 (1991).

CORCORAN, Justice, specially concurring in part.

I join with Justice Moeller in his special concurrence.