NOTICE: NOT FOR PUBLICATION.
UNDER ARIZ. R. SUP. CT. 111(c), THIS DECISION DOES NOT CREATE LEGAL PRECEDENT
AND MAY NOT BE CITED EXCEPT AS AUTHORIZED.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

CHRISTOPHER ROBERT YOUNGS, *Appellant.*

No. 1 CA-CR 11-0380
FILED 08-28-2014

Appeal from the Superior Court in Maricopa County
No. CR2010-006043-001DT
The Honorable Christopher T. Whitten, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Linley Wilson
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Spencer D. Heffel
*Counsel for Appellant*

**MEMORANDUM DECISION**

Judge Lawrence F. Winthrop delivered the decision of the Court, in which
Presiding Judge Patricia A. Orozco and Judge Kenton D. Jones joined.

**W I N T H R O P,** Judge:

¶1        Christopher Robert Youngs ("Appellant") appeals his convictions for ten counts of sexual exploitation of a minor based on his possession of ten computer videos in which a minor under fifteen years of age was "engaged in exploitive exhibition or other sexual conduct," each a class two felony and dangerous crime against children.  Appellant contends the trial court abused its discretion by (1) denying his request for appointed counsel at a March 10, 2011 status hearing; (2) permitting the State to admit video samples for each of the charged offenses; and (3) permitting the State to introduce other act evidence.[1]  For the reasons set forth below, we affirm.

### FACTS AND PROCEDURAL HISTORY[2]

¶2        In 2008, while investigating an internet user distributing child pornography, Colorado Springs Police Detective Blackwell became aware of other internet users with whom his original suspect was sharing child pornography, including a person later determined to be Appellant, who used the name "iamthecumster" at Yahoo.com.   Through further investigation, the detective was able to associate that name with other e-mail accounts, including "Chris Youngs 2005" at Yahoo.com.

¶3        Posing as a pedophile, Detective Blackwell sent an "invite" to Appellant and was accepted as a "friend."  Their chats immediately took on a sexual tone, and included "discussing having sexual acts with under-age persons."  Appellant often referred to his sexual experiences with children, stating at one point:  "You ought to try.  You will never go back to older afterwards.  It is an awesome feeling doing them."  When the detective responded that some of Appellant's stories seemed "very fantastical," Appellant replied, "[B]elieve whatever you like.  I am telling you like it is."

¶4        Detective Blackwell eventually learned Appellant was physically out of the country, but would be arriving in the United States on December 4 and "working west."  Appellant told the detective that San Diego was "looking excellent" with a "Victim 12 YO" he was scheduled to

---

[1]        Appellant abandoned a fourth argument raised in his opening brief regarding the admission of "Exhibit 41" after having ascertained the exhibit was not presented at trial.

[2]        We view the facts in the light most favorable to sustaining the verdicts and resolve all reasonable inferences against Appellant.  *See State v. Nihiser*, 191 Ariz. 199, 201, 953 P.2d 1252, 1254 (App. 1997).

meet, and that he had lined up for the trip "right now 14 slits from 8 through 14 [years of age]." In a chat with the detective on December 8, Appellant stated he was going to meet a "14 [year-old] white whore" at a Phoenix truck stop and still had "the one in S.D.," who was "young and untried."

¶5 Throughout their chats, Detective Blackwell was trying to locate Appellant through Appellant's Internet Protocol ("IP") address. By December 12, with the assistance of FBI agents, the detective had traced Appellant's IP address to a New Mexico hotel and then to an Econo Lodge in Tempe, Arizona. That same day, the detective contacted Appellant and asked if he was "enjoying Phoenix." Appellant eventually responded, "[S]orry, just stepped out of the shower. Was drowning this slit, so she knows who is the boss."

¶6 At that point, Detective Blackwell believed a child was in actual danger. He continued to engage Appellant in a chat, hoping if he kept Appellant engaged, Appellant would not be harming the child.[3] At the same time, through an emergency order, the detective obtained a list of the occupants at the New Mexico hotel and provided it to Tempe police, whom he apprised of the situation. Appellant's was the only male name that appeared on both the guest list of the New Mexico hotel and the Tempe Econo Lodge.

¶7 Late in the evening of December 12, a police SWAT team made a forced entry into Appellant's Tempe motel room in an effort to secure the safety of the child suspected to be there. Appellant was standing in the room, but police did not locate a child in either the room or Appellant's rental car, which was parked directly outside. During the "quick sweep" of the room, however, the sergeant leading the SWAT team noticed a laptop computer and ordered everyone removed from the room to avoid "issues of contamination." Police obtained a search warrant and, at approximately 1:30 a.m. on December 13, searched Appellant's hotel room and rental car. Among the items seized were an Acer laptop computer, a Kingston flash drive, Appellant's Australian driver's license, and various debit and credit cards with Appellant's name on them.

¶8 Tempe detectives conducted forensic examinations of the laptop and the Kingston flash drive. On the flash drive, detectives located

---

[3] During their chat, however, Appellant claimed to have "put two safety pins through [the child's] nipples," and he "could hear the skin parting as [he] put them through." This message further heightened the detective's sense of urgency in locating Appellant and the child.

images and videos containing child pornography organized in ten file folders. When Detective Bailey, the eventual case agent, turned on the laptop computer, two programs "automatically launch[ed]" on the screen: "Yahoo messenger" and "Microsoft messenger." The Yahoo program "had the screen name or the e-mail address of iamthecumster" at "yahoo.com" and the Microsoft program had "the name of iamthe1cumster" at "hotmail.com." Detective Bailey determined the flash drive had recently been connected to the laptop because the computer's "recent files" list showed a path to folders and file names contained on the flash drive.

**¶9** Detective Bailey had ten of the videos contained on the Kingston flash drive reviewed by Dr. Kathryn Coffman, Medical Director of the Child Abuse Assessment Center at St. Joseph's Hospital. Given Dr. Coffman's determination that each of the children depicted in the videos was a minor, the State charged Appellant with ten counts of sexual exploitation of a minor, each a class two felony and dangerous crime against children, alleging that Appellant "knowingly distributed, transported, exhibited, received, sold, purchased, electronically transmitted, possessed, or exchanged any visual depiction . . . in which a minor under fifteen years of age is engaged in exploitive exhibition or other sexual conduct." *See* Ariz. Rev. Stat. ("A.R.S.") § 13-3553 (West 2014).[4]

**¶10** Appellant represented himself throughout his trial, and the jury found him guilty of all charged offenses. The trial court sentenced him to ten consecutive seventeen-year terms of imprisonment. This court has jurisdiction over Appellant's timely appeal. *See* Ariz. Const. art. 6, § 9; A.R.S. §§ 12-120.21(A)(1), 13-4031, 13-4033.

**ANALYSIS**

*I.    Appellant's Alleged Request for Counsel*

**¶11** Appellant was indicted on May 6, 2010.[5] In August 2010, Appellant filed a motion to dismiss his then-counsel and represent himself

---

[4]    We cite the current version of the statutes unless changes material to our decision have since occurred.

[5]    An earlier ten-count indictment was dismissed and an eleventh count was added. Before trial, however, the court granted Appellant's motion to sever Count 11, after the State withdrew its objection to the severance.

4

at trial. After explaining the advantages of having counsel and engaging Appellant in a full Rule 6.1(c) colloquy, *see* Ariz. R. Crim. P. 6.1, the trial court found Appellant had "knowingly, intelligently, and voluntarily" waived his right to counsel and granted Appellant's request to represent himself at trial. The court secured a signed waiver of counsel form from Appellant and appointed his then-counsel as advisory counsel. In December 2010, the trial court granted Appellant's motion to replace his advisory counsel with new advisory counsel, who assisted him throughout the remainder of the proceedings.

¶12         At a March 10, 2011 status hearing, with trial set to begin on March 23, the prosecutor asked the trial court to confirm Appellant was "okay with representing himself as the trial date is upon us and I understand that he's going pro per." The court agreed to address the prosecutor's concerns and advised Appellant that he faced "a lot of tough legal issues," and advisory counsel "understands what good and bad strategies are at trial." The court then asked Appellant, "Do you want me to appoint him? I'm happy to do that." Appellant stated he did not have access to his accounts or else he "would have hired an attorney." The court responded, "Well, I'm giving you an attorney for free, who's good, if you want one."

¶13         The prosecutor interjected and clarified she was not encouraging advisory counsel to take over the case, but desired to avoid a situation similar to one she had previously encountered, in which a *pro per* defendant had "just hand[ed] over their case to advisory counsel," who was "behind the eight-ball because this case had been dropped in their lap," only to have the defendant, "at some point," want to take the case back because he was unhappy with how counsel was handling the situation. The prosecutor also wanted the court to ensure Appellant understood there could be no "hybrid representation."

¶14         The trial court advised Appellant that advisory counsel had "stayed up to speed enough to be able to take this case over," and if Appellant wanted him to do so, Appellant should "have him take over now" because "the further you get down the road doing it yourself, the harder it is for [counsel] to undo anything that you've messed up." The court reiterated that appointed counsel would cost Appellant nothing, explained the court would not allow Appellant to "go back and forth" with hybrid representation, and advised that having advisory counsel take over as lead counsel "might be a wise decision, given the legal complexities, but it's your decision."

¶15      At that point, advisory counsel informed the court that Appellant had "a very specific and definite notion of how he wants to proceed with the case," which was "not necessarily" the path counsel would choose if he were to take over, and "there might be some problems with that." Counsel also informed the court he was not prepared to start the trial on the scheduled date because "being advisory counsel is a far different creature than taking over the case and preparing for trial on your own" and noted that a pending family vacation would likely prevent him from becoming fully prepared by then. When asked by Appellant if he felt "comfortable" taking over the case at that point, advisory counsel replied that he did not, but also indicated he would cancel his vacation, if necessary, to prepare for trial and ensure he could "be an effective lead counsel."

¶16      The court told Appellant it would appoint advisory counsel as lead counsel if Appellant wished, but would not order advisory counsel to "cancel the vacation he's got planned." Appellant replied, "No, I don't expect him to." After further discussion, Appellant stated that "[i]n fairness" to advisory counsel, he would continue representing himself. When the court began to further discuss the topic, Appellant stated, "I am not going to change."

¶17      The prosecutor again interjected, stating she did not want to "belabor this point," but was concerned Appellant may have chosen to continue to represent himself only due to a concern that advisory counsel would be ineffective, and she didn't "want to try this case twice." The court once again addressed Appellant, clarifying whether Appellant wanted the court to appoint advisory counsel to represent him:

> THE COURT: I will be happy to appoint an attorney. I'm not going to delay the trial yet again for that purpose. If [Appellant's] decision and the lack of timeliness of his decision has cost him some quality in counsel, then that's a risk he took and he will have to continue to accept.
>
> [THE PROSECUTOR]: Okay.
>
> THE COURT: But I'm not going to order somebody to take over, *he has to ask for it*, and I think he understands and we've made very clear, every hour he waits to ask for it costs him quality of preparation time.
>
> . . . .

6

THE COURT:  Mr. Youngs, do you have any question about the predicament you're in?  You're either going forward pro per or you're going to ask for your attorney, who's advisory right now, to become full --

[APPELLANT]:  In all fairness, Your Honor, to [advisory counsel], I retract your offer.

THE COURT:  You reject my offer?

[APPELLANT]:  Okay.  Yeah.

THE COURT:  And that offer stays open.  You can make that decision later on if you want, but once you've made it, I'm not going to let you go back.

[APPELLANT]:  Correct.

THE COURT:  And every hour you wait to make it costs you quality in [defense counsel's] ability to prepare and be adequate in your defense.

[APPELLANT]:  Yeah.  It's unfair to him, yeah.

THE COURT:  I don't care if it's unfair to him.

[APPELLANT]:  No, I understand you.

THE COURT:  If you lose, you go to prison for the rest of your life.

[APPELLANT]:  I do realize that.

THE COURT:  If [defense counsel] wins or loses, he goes home.

[APPELLANT]:  Yes.

THE COURT: So don't worry about him.  Worry about yourself getting the best representation you can here.

(Emphasis added.)  After the court asked Appellant if there was anything else he wished to discuss, Appellant replied in the negative and changed the subject to the issue of subpoenaing witnesses.  Trial began on March 23 as scheduled, and Appellant represented himself throughout the trial.

¶18        On appeal, Appellant does not challenge the validity of his original waiver of counsel in August 2010.[6]  Instead, he argues that his March 10, 2011 statements to the court constituted a revocation of his earlier waiver and the trial court abused its discretion in permitting his waiver of counsel to continue under the circumstances.  We do not agree.

¶19        "The right to represent oneself is a constitutional right." *State v. Rickman,* 148 Ariz. 499, 503, 715 P.2d 752, 756 (1986) (citing *Faretta v. California*, 422 U.S. 806, 819-20 (1975)).  Once a defendant waives the right to counsel, the waiver continues until the defendant clearly indicates a change of mind.  *Id.*  "Therefore, it follows that a trial court which has allowed a defendant to proceed *pro se,* must not infringe on that right by taking away control of the case without an unequivocal revocation of the defendant's waiver of counsel."  *Id.*

¶20        Having reviewed the record, we conclude Appellant's statements at the March 10 hearing do not represent an "unequivocal revocation" of his right to represent himself. *See id.*  We note Appellant did not raise the issue of having trial counsel appointed or waiving his right to self-representation at the March 10 hearing.  Instead, the issue arose out of what appears to have been an abundance of caution on the parts of the prosecutor and trial court to confirm Appellant's earlier decision.  Thus, the fact the issue was even discussed at the March 10 hearing is no indication of an intention on Appellant's part to revoke his right to represent himself, let alone an unequivocal waiver of his right to do so.  *See id.*

¶21        Appellant argues his waiver became "involuntary" at the March 10 hearing when he informed the trial court he "would have hired" private counsel had he had access to his accounts.  However, even when the court responded that it would appoint "an attorney for free, who's good," if Appellant wished, Appellant did not ask the court to do so.  Although the Sixth Amendment guarantees a criminal defendant a right to representation by counsel, it does not entitle an indigent defendant to counsel of choice. *State v. Gomez*, 231 Ariz. 219, 224, ¶ 19, 293 P.3d 495, 500 (2012) (citations omitted).  In any case, the mere statement that he "would have hired" a private attorney if he had the funds hardly amounted to an "unequivocal revocation" of his right to represent himself or a request that the court appoint counsel. *See Rickman*, 148 Ariz. at 503, 715 P.2d at 756.

---

[6]        We review for an abuse of discretion a court's determination that a defendant has knowingly, intelligently, and voluntarily waived his right to counsel. *State v. Gunches*, 225 Ariz. 22, 24, ¶ 8, 234 P.3d 590, 592 (2010).

¶22 Appellant further argues that the fact advisory counsel felt "unprepared" and the court was unwilling to grant a continuance forced him to continue on his own or accept an ineffective attorney. He maintains this dilemma deprived him of a "meaningful choice" and rendered his decision to continue to waive counsel involuntary. However, the fact remains that the dilemma, if there was one, was wholly created by Appellant's initial and voluntary decision to represent himself, and not by anything for which either the State or the court was responsible. Even if Appellant had requested the appointment of counsel on March 10, the court was not required to grant him a continuance at that late date. *See State v. Dixon*, 126 Ariz. 613, 616, 617 P.2d 779, 782 (App. 1980) (stating that the unlimited right to withdraw a waiver of the right to counsel does not entitle a defendant to a continuance through an eleventh-hour request for counsel).

¶23 It is clear from the record that, if anything, on March 10 the trial court was attempting to assist Appellant by ensuring he was fully cognizant of his circumstances and giving him an additional opportunity to have appointed counsel, if he wished, even at such a late date, because it would still be to his advantage "to have [counsel] take over now if you're going to have him take over." Furthermore, on March 10, a competent attorney was immediately available to Appellant who was familiar with his case since at least January 2011, and who would have had an additional two weeks to fully prepare for trial.[7] Despite the trial court's efforts and its

---

[7] Appellant relies on *Commonwealth v. Cavanaugh*, 353 N.E.2d 732 (Mass. 1976), and *Gilbert v. Lockhart*, 930 F.2d 1356 (8th Cir. 1991), for his argument that "[a] defendant's right to counsel is not satisfied by the mere presence of a competent attorney if that attorney is not prepared." *Cavanaugh*, 353 N.E.2d at 739 (citation omitted). Those cases are inapposite. In the present case, Appellant "knowingly, intelligently, and voluntarily" elected to represent himself and had been doing so for approximately seven months before trial. Moreover, by March 10, advisory counsel had been working with Appellant for at least two months, was informed of Appellant's trial strategy, and, although avowedly not as prepared as he might have been had he been appointed counsel from the start, still had an additional two weeks to prepare for trial. Furthermore, Appellant never unequivocally revoked his right to represent himself but only considered the possibility at the trial court's suggestion – and after again being advised of the risks associated with self-representation, ultimately rejected it. The circumstances in this case are sufficiently distinguishable from those in *Cavanaugh* and *Gilbert* and do not support the conclusion that Appellant's

advice to Appellant that he "[w]orry about yourself getting the best representation you can here," Appellant rejected the trial court's offer and chose to continue to represent himself.

¶24 Finally, contrary to Appellant's arguments, the trial court more than "adequately instructed" him on the advantages and disadvantages of continuing self-representation on March 10. Appellant never unequivocally revoked his waiver of counsel, and instead knowingly and voluntarily chose to continue to represent himself at trial. The trial court committed no abuse of discretion in permitting Appellant to do so. *See Gunches*, 225 Ariz. at 24, ¶ 8, 234 P.3d at 592.

## II. Admission of Samples of Videos of Charged Offenses

¶25 Before trial, the State gave notice it intended to introduce into evidence at trial "[a]ll physical, scientific or forensic evidence that was obtained and the analysis thereof." During *voir dire*, the court informed the venire panel that, due to the nature of the charges, they might be asked to view some samples of videos in Appellant's possession "that may include graphic depictions of children." The court advised the venire panel that some of the video samples "may be 20 to 40 seconds long," and asked if there was anybody who could not serve on the jury "because of that" and because it might affect his or her ability to be "fair and impartial." Several members of the venire panel indicated they would not be able to view such videos and remain "fair and impartial," and the trial court excused them.

¶26 After the jury was empanelled and released for the day, the trial court expressed its general reluctance at playing the video samples for the jury, stating, "If words can describe the images, I don't want you to show the images. I don't think anybody benefits from that. And I think it really does some serious harm to the jurors [-] to everybody in the room." The court stated it would "appreciate it" if the images did not have to be shown, but then it also stated, "If not, then we will do what we have to do to make a fair determination." After further discussion, the court suggested that the parties discuss whether any stipulations about presentation of the evidence could be reached. After a recess, the parties indicated to the court they had made some agreements, but the prosecutor explained the parties were "at an impass[e] for the 10 charged images because . . . everybody in the room sees this in a very different way" and that it was ultimately the jury that had to find it was "child pornography." Although the prosecutor

---

decision to continue to represent himself was anything other than voluntary.

agreed the images were "graphic" and "upsetting," she argued it was important for the jurors to see what was on the videos rather than, for example, just "reading something that says male voice could be heard saying see you, good girl, good baby, as he's penetrating the baby's anus." The prosecutor indicated she would not stipulate to not show the jury samples of the actual videos for the child pornography charges because it was the State's "burden to demonstrate that's child pornography, and I believe the best evidence is the video." The court asked whether the defense had offered "[t]o either read the stipulations or a stipulation that it was child pornography," and the prosecutor stated, "No." The prosecutor also indicated she would be unlikely to agree to such a stipulation.

¶27 Before the second day of trial, Appellant filed a "Request to Suppress Showing of Videos & Photographs to [J]ury," arguing the sole purpose for introducing the evidence was to prejudice him by inflaming the passions of the jurors against him. The trial court subsequently denied Appellant's motion and ruled that "a brief sample of any charged video which is representative" was admissible at trial. The court also issued a minute entry ruling in which it stated it had "considered the probative value of each item [of evidence] and balanced that value against the danger that its use would unfairly prejudice [Appellant], confuse the jury, or be cumulative." The minute entry ruling also noted:

> The file names and a representative sample of the video of each charged digital video are admissible. *See State ex rel. Romley v. Galati*, 193 Ariz. 437, 973 P.2d 1198 (App. 1998); *United States v. Ganoe*, 538 F.3d 1117 (9th Cir. 2008).

(Edits added.)

¶28 During Detective Bailey's testimony, the trial court admitted without objection the State's Exhibit 42, which contained brief samples of the videos upon which Counts 1-10 were based, and allowed the prosecutor to play the video samples for the jurors. The court then took a ten-minute recess. Before the jury returned to the courtroom, Appellant asked to make a record, and stated:

> Okay. I noticed at the break, sir, that two of the female jurors sprinted out, sobbing, and this is why I filed a motion to have these videos read, and the Court, prior to stating that the videos could be played, was of the same idea.
>
> Now, the Court can see that the passions were inflamed, and this is for improper purpose, and the State has

11

used videos only for the sole purpose of inflaming their passions.

The jury is no longer capable of dispassionately evaluating all of the evidence, and I feel I can't -- or I cannot get a fair verdict, and I ask the Court for a mistrial.

The trial court summarily denied the motion.

¶29 Appellant asked the trial court if, "because of the mental state of the jury," it would permit him to "put off" his cross-examination of Detective Bailey until the following Monday, which was the next day of trial. The court effectively denied the motion but agreed to ask the jurors, when they returned, "whether they feel like they can go on. If they say no, we'll stop; if they say yes, we'll keep going."

¶30 After the jurors were reseated in the courtroom, the court addressed the jury as follows:

I'm probably stating the obvious when I indicate that it was a little bit emotional for some of you before the break.

Is there anybody who feels they can't go on right now? If so, let me know and we'll take a longer break, for the rest of the day, and start again on Monday. Anyone? I don't see any hands.

Appellant then proceeded with his cross-examination of Detective Bailey.

¶31 Before the jury was present at the beginning of the next trial day, the prosecutor asked to make a record in light of Appellant's motion for mistrial. She noted the video samples "were shown for a maximum of ten seconds each, some as little as three seconds." She also stated it was "the State's intent to show them just the one time," although "depending on what the defendant argues, that could change, but from a [Rule] 403 standpoint, we only anticipate showing [the video samples] one time."

¶32 The trial court agreed with the prosecutor and explained why it had denied Appellant's motion for mistrial:

I think that's right, and maybe a better record should have been made right at the time by me also.

There were two female [jurors] who appeared a little teary-eyed after the videos stopped.

I think the detective, when he played most of the videos, said, after they were played, how long, many seconds, they were played, and I asked the court reporter, who said she did get down the amount of time he was saying. I'm not sure if that was as to all of them, but it was as to most. None of them, I thought, were played for more than five seconds, but I could be wrong.[8]

. . . .

The two [jurors] who appeared teary-eyed didn't go running out of the court. They waited until -- it appeared to me they were a little emotional. We took a recess. As we took a recess, they walked out in order, in the order in which they were seated. Nobody jumped over anybody or was that emotional.

When they came back in, their emotions seemed to be under control. We asked them whether they could continue, and all of them, without any hesitation, appeared to be ready to go, so I don't think that there's -- that's why I didn't grant it.

¶33 On appeal, Appellant argues the trial court abused its discretion when it permitted the State to show the video samples to the jurors. He maintains the graphic verbal description of each offense by the State's witnesses "sufficiently proved the charged crimes." He also argues that motion pictures are different in kind from even still pictures of the acts involved because they force jurors to "participate" in the very illegal acts that constitute the crimes. According to Appellant, forcing the jurors to watch the graphic moving images of child pornography on each charged count improperly influenced their verdicts because it not only "inflame[d] the precise sort of passions that influence a jury to decide a case based on emotion rather than proper legal procedure," but it also caused jurors to blame him for having to watch those images. Appellant contends his

---

[8] The trial transcript records most of the playing times of the videos, but not all. The playing times for Counts 1, 2, and 4 are not recorded, but the prosecutor avowed the videos would be no more than "approximately five to ten seconds." As to Count 3, the amount of time noted is "three seconds"; Count 5, "[s]ix seconds"; Count 6, "[s]ix seconds"; Count 7, "four seconds"; Count 8, "seven seconds"; Count 9, "[s]ix seconds"; and Count 10, "four seconds."

convictions must be reversed because the subject matter of the videos was so disturbing that it cannot be said "beyond a reasonable doubt that they did not incite a passion in the jury that might have led them to convict Appellant on improper emotional grounds."

¶34        All relevant evidence is admissible unless otherwise prohibited by law. Ariz. R. Evid. ("Rule") 402. Because the trial court is in the best position to balance the probative value of evidence against its prejudicial effect, that court has considerable discretion in determining the relevance and admissibility of evidence. *State v. Kiper*, 181 Ariz. 62, 65, 887 P.2d 592, 595 (App. 1994). We will not disturb the trial court's ruling absent a clear abuse of discretion. *Id.*; *see also State v. Spencer*, 176 Ariz. 36, 41, 859 P.2d 146, 151 (1993) (stating that this court reviews for an abuse of discretion a trial court's decision to admit evidence challenged under Rule 403).

¶35        The State has the burden of proving every element of an alleged crime beyond a reasonable doubt. *State v. Farley*, 199 Ariz. 542, 544, ¶ 8, 19 P.3d 1258, 1260 (App. 2001). As a general rule, "the [S]tate is not required to accept a stipulation when the prejudicial potential of the evidence is substantially outweighed by the [S]tate's legitimate need to prove the facts." *State v. Leonard*, 151 Ariz. 1, 8, 725 P.2d 493, 500 (App. 1986). It is for the trial court to undertake the relevant balancing test under Rule 403 when an offer to stipulate is made. *Id.*

¶36        The indictment in this case described the sexual conduct in the videos possessed by Appellant for each of the ten counts as follows: Count 1: "(to-wit: a computer video titled: babyshivid-owl04-vid.avl)"; Count 2: "(to-wit: a computer video titled: Babyshivid-Samples 3yo gets it every way imaginable 5m46s.mpg)"; Count 3: "(to-wit: computer video titled: babyshivid-shisuck02.avi)"; Count 4: "(to-wit: a computer video titled: Phtc 4Yo Nati.mpeg)"; Count 5: "(to-wit: a computer video titled: vidGOOD! 3yo raped during bathtime.avi)"; Count 6: "(to-wit: a computer video titled; GOOD! 2yo girl getting raped during diaper change – Babyshivid-Pussy Pounded Pthc Pedo Child Fuck (kiddy ddoggprn nak.avi)"; Count 7: "(to-wit: a computer video titled: vid vicky.avi)"; Count 8: "(to-wit: a computer video titled: !!!(babyj-captive).mpeg)"; Count 9: "(to-wit: a computer video titled: 00004625 2yo ass fuck she cries for mommy nasty pthc pedo 1yo 3yo 4yo.2.mpg)"; and Count 10: "(to-wit: a computer video titled: babyshivid-assfucked-full.mpg)". During her testimony, Dr. Coffman provided developmental assessments and age

14

estimates for the children depicted in the videos,[9] and she described the actual sexual conduct she observed in each of the videos. For example, she testified that in the video relevant to Count 1, she saw "a small girl who was being vaginally penetrated by an adult male." Phoenix Police Detective Guzman, the State's forensic computer expert, testified that "[w]ithout exception," every one of the children depicted in the videos was a real child and not a computer-generated image or virtual child.

¶37          Despite this evidence, and the fact that the sample videos were admittedly unsettling, the State argues that viewing the videos in this case was essential to its burden of proving Appellant knowingly possessed visual depictions of children engaged in exploitive exhibition or sexual conduct. The State maintains that a proposed stipulation to verbally describe the videos, or even a witness's verbal description of the contents, is only "second-best evidence" that a jury could choose to reject. *See, e.g., State ex rel. Romley v. Galati*, 195 Ariz. 9, 12, ¶ 16, 985 P.2d 494, 497 (1999) (concluding that the defendants' proposed stipulation to elements of the charged crime did not entitle them to a bifurcated trial); *see also State v. Lopez*, 209 Ariz. 58, 60, ¶ 8, 97 P.3d 883, 885 (App. 2004) (relying on *Galati* to conclude that the trial court did not err in refusing to compel the State to accept a stipulation to an element of the crime – that the defendant was a prohibited possessor - and thereby remove from the jury's consideration that the defendant had a prior felony conviction).

¶38          We do not dispute the videos themselves are the best evidence of the crimes charged in this case and may be used to prove an element of the crimes. However, the State's argument, taken to its logical conclusion, would mean that a defendant's stipulation in a child sexual exploitation case might be virtually excluded regardless of Rule 403 balancing considerations.

¶39          In *State v. Coghill*, 216 Ariz. 578, 169 P.3d 942 (App. 2007), this court considered, without deciding, an issue similar to the one Appellant raises. The defendant in *Coghill* was also charged with sexual exploitation of a minor for possession of child pornography videos. *See id.* at 586, ¶ 35, 169 P.3d at 950. He offered to stipulate that all of the videos were identical to the charged items in the indictment and constituted a violation of the

---

9          As to the videos associated with Counts 1, 2, 3, 5, 6, and 7, Dr. Coffman estimated each child depicted was under five years old. As to the videos associated with Counts 4, 9, and 10, she estimated each child depicted was under ten years old. As to the video associated with Count 8, she estimated the child depicted was under thirteen years old.

sexual exploitation of a minor statute. *Id*. The State rejected his offer and excerpts of fifteen videos were played for the jurors. *Id*. On appeal, the defendant argued that showing the videos was improper in light of his offer to stipulate because the probative value of the offensive material was minimal and the risk of unfair prejudice was great. *Id*.

¶40 Because the defendant in *Coghill* did not make that argument before the trial court or ask the trial court to preclude the videos on that basis once the State refused his offer to stipulate, this court did not address the issue in that case. *Id*. at 586-87, ¶¶ 35, 38, 169 P.3d at 950-51. However, the court noted:

> Coghill offered to stipulate that the videos shown to the jury were identical to those described in the indictment and that they violated § 13-3553. Each count in the indictment clearly described the sexual conduct portrayed in the corresponding computer video file and identified the male or female participants as "prepubescent." Thus, Coghill's stipulation would neither have removed an element of the offense from the jury's consideration nor shielded the jury from knowledge of the nature of the crime charged.

*Id*. at 587, ¶ 37, 169 P.3d at 951 (citation omitted).

¶41 Unlike Coghill, Appellant argued in his case that the evidence should be precluded, but we have no indication as to what precisely he offered to stipulate, both because of the State's apparent refusal to entertain the possibility of a stipulation and because Appellant failed to make a record of any offer he made. As noted above, not all of the descriptions of the contents of the videos contained in the indictment in the present case are as complete or graphic for each count as those descriptions appear to have been for each of the counts in the indictment in *Coghill*. *See id*. Therefore, for example, a simple stipulation by Appellant to the descriptions contained in the present indictment might not have sufficed. However, Appellant appears not to have challenged the verbal descriptions of the contents of each video provided by Dr. Coffman at trial, which would have provided the missing information. Thus, we are reluctant to fault Appellant for any lack in the record supporting his contention that a stipulation would have been sufficient to preclude the showing of the videos in this case.

¶42 Nonetheless, we are mindful that, unlike the trial court in *Coghill*, the trial court here was presented with and considered the

preclusion arguments extensively, performed the requisite balancing test, and ultimately concluded the probative value of showing the excerpts was not outweighed by the risk of prejudice to Appellant. *See generally* Ariz. R. Evid. 403. A trial court need not exclude relevant evidence simply because its admission may arouse the emotions of the jurors. *See State v. Gerlaugh*, 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982), *supplemented by* 135 Ariz. 89, 659 P.2d 642 (1983). Furthermore, the trial court took additional measures to reduce the possibility of unfair prejudice. It vetted the jury panel specifically for members who stated they could see such videos and remain fair and impartial. It only permitted the State to present a very brief "sample" of each video, the longest of which appears to have been seven seconds in length. When two jurors appeared affected by the viewing of the videos, the court questioned all of the jurors to ascertain whether any of them was incapable of continuing with the trial that day. According to the court, all of them indicated "without any hesitation" that they were capable of continuing, and the court appears to have credited their avowals. *See, e.g., State v. Payne*, 233 Ariz. 484, 510, ¶ 100, 314 P.3d 1239, 1265 (2013) (recognizing that the trial court is in the best position to observe a juror's demeanor and the tenor of his answers and determine first-hand whether the juror can render a fair and impartial verdict).

**¶43** Finally, the trial court instructed the jurors during final instructions that they "must not be influenced by sympathy or prejudice" in rendering their verdicts. *See State v. LeBlanc*, 186 Ariz. 437, 439, 924 P.2d 441, 443 (1996) (stating that jurors are presumed to follow the court's instructions). Based on the record before us, we cannot say the trial court abused its discretion in denying Appellant's motion to preclude the video excerpts. *See Kiper*, 181 Ariz. at 65, 887 P.2d at 595.

**¶44** However, even assuming *arguendo* based on the reasoning of *Coghill* that it was error for the court to deny the motion to suppress and permit Appellant to stipulate to verbal descriptions of the videos' contents, we are convinced beyond a reasonable doubt, based on the record before us, that any error in their admission was harmless. *See State v. Bocharski*, 200 Ariz. 50, 57, ¶ 28, 22 P.3d 43, 50 (2001) (stating that the court's focus was not on whether a guilty verdict would definitely have been rendered without the admission of gruesome photographs, but whether the guilty verdicts rendered were surely unattributable to the error (citations omitted)). Appellant's defense in this case was somewhat confusing, but essentially appears to have been an argument that the State could not prove the Kingston flash drive belonged to him. However, the State's evidence established that Appellant used "iamthecumster" as his e-mail address in his chats with Detective Blackwell; that the Kingston flash drive found in

the Tempe hotel room, of which Appellant was the sole occupant, contained all the child pornography videos; that the Kingston flash drive was plugged in at some point to the Acer laptop computer located in Appellant's Tempe hotel room; that other flash or hard drives later located in a hotel room rented by Appellant in Tucson contained copies of child pornography images that were also on the flash drive found in Appellant's Tempe hotel room; and that the charged videos unequivocally depicted images of real children under the age of fifteen engaged in sexual conduct. Based on this evidence, we are convinced beyond a reasonable doubt the jury's determination that Appellant possessed the child pornography videos is not attributable to the brief view of the videos themselves or that the jury's determination would have been different if it received only verbal descriptions of the contents of the videos, as Appellant maintains. For these reasons, we conclude the trial court did not abuse its discretion in admitting the video samples and reversal for this reason is not merited.

### III.    Other Act Evidence

**¶45**         In its notice of disclosure, the State announced its intent to introduce evidence of Appellant's other acts pursuant to Rules 404(b) and (c), Ariz. R. Evid. The Rule 404(b) and (c) evidence was filed by the State under seal. After jury selection on March 23, 2011, the trial court announced it had "not seen any motions that seek to preclude any of the State's disclosed exhibits or listed evidence under either [Rules] 403 or 401 or 402 or 404 theory." The court stated it would do its best to make the necessary determinations, even if there was no actual objection, "watching out for evidence that I think is more prejudicial than probative." On March 30, the trial court informed the parties it had prepared a draft of a minute entry of its evidentiary rulings, including decisions regarding the State's Rule 404(b) and (c) evidence and briefly reviewed them in open court.[10] On April 1, 2011, the trial court issued a detailed minute entry order delineating all of its rulings and the reasoning behind them.

**¶46**         Among eight items of evidence admitted by the court were the following three:

---

[10]     Appellant voiced only one objection to the court's rulings regarding other act evidence. He objected on the basis of unfair prejudice to the introduction of his statements about using safety pins on his alleged victim the night he was arrested. The trial court denied the objection after previously indicating it had conducted a Rule 403 analysis. On appeal, Appellant raises no challenge to the admission of this evidence.

3.  A non-cumulative list of the file names of other images stored on the same digital storage device as the charged images[.]

4.  A non-cumulative list of the file names of other images stored on any device forensically linked to [Appellant] which are similar to the file names of the charged offenses[.]

. . . .

7.  Entries in chat rooms purportedly made by [Appellant] indicating a sexual interest in young girls (except those referring to attempts to "buy" a child)[.]

¶47         On appeal, Appellant objects, for the first time, to the admission of these three sets of evidence.  He argues they "were irrelevant, because [his] defense was that he didn't do it," and he "told the judge his defense was denial."

¶48         A defendant who fails to object to an alleged error at trial forfeits his right to appellate relief except in those rare instances involving fundamental error.  *State v. Henderson*, 210 Ariz. 561, 567, ¶ 19, 115 P.3d 601, 607 (2005).  Fundamental error is "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial."  *Id.* (citations omitted).  To prevail under this standard of review, the defendant bears the burden to establish that fundamental error exists and the error in his case caused him prejudice.  *Id.* at ¶ 20 (citations omitted).  Before we engage in fundamental error review, however, we must first find the trial court committed some error.  *State v. Lavers*, 168 Ariz. 376, 385, 814 P.2d 333, 342 (1991).

¶49         In this case, the trial court committed no error in admitting the challenged evidence.  Rule 404(c) allows the admission of "evidence of other crimes, wrongs, or acts . . . if relevant to show that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the offense charged."  Such evidence is admissible if the trial court finds that: (A) "[t]he evidence is sufficient to permit the trier of fact to find that the defendant committed the other act"; (B) "commission of the other act provides a reasonable basis to infer that the defendant had a character trait giving rise to an aberrant sexual propensity to commit the crime charged"; and (C) "the evidentiary value of proof of the other act is not substantially outweighed by danger of unfair prejudice, confusion of issues, or other factors mentioned in Rule 403."  Ariz. R. Evid. 404(c)(1)(A)-(C).  The record

19

shows the trial court properly considered these factors in determining the evidence was admissible. Furthermore, contrary to Appellant's contentions, the evidence is relevant to establish his aberrant sexual propensity to commit the crimes charged and, also, to rebut the arguments that he did not knowingly possess the images of child pornography found on the flash drive in his Tempe hotel room, and "was possibly a target before the Tempe Police became involved" and merely a victim "of a sting gone wrong."

¶50            Evidence at trial established that, on December 16, 2008, FBI agents searched a Tucson hotel room registered to Appellant. In that room, they located Appellant's Great Britain and New Zealand passports, an external hard drive, and three thumb drives (also described as "two Cruzer flash drives and one Kingston flash drive").

¶51            At trial, Detective Bailey testified he recovered deleted files on the external hard drive found in Appellant's Tucson hotel room that matched files containing pornographic images found on the flash drive located in Appellant's Tempe hotel room. The detective also testified that one of the Tucson flash drives contained four deleted files with matching names that included the same pictures of children found on the Tempe drive. The fact that drives found in Appellant's Tucson hotel room contained images similar to the ones on his Tempe flash drive was highly probative of the inference that Appellant knowingly possessed the pornographic images on the Tempe drive. That was particularly true as one of the Tucson drives containing pornographic images also contained scanned copies of Appellant's birth certificate and passports.

¶52            Similarly, the chat room entries were relevant and admissible both under Rule 404(c) and under Rule 404(b) to establish proof of Appellant's motive, intent, knowledge, identity, and absence of mistake in possessing the pornographic images. *See* Ariz. R. Evid. 404(b). Thus, for example, Detective Blackwell's testimony that he chatted with a person later determined to be Appellant who used the name "iamthecumster" in a Yahoo chat room, and who immediately began discussing having sex with underage persons, counters Appellant's argument that he was an innocent "victim" who had no knowledge of the pornographic content of the Tempe flash drive found in his possession.

¶53            Additionally, during final instructions, the trial court gave the jury the proper limiting instructions, including: "You may not convict the defendant of the crimes charged simply because you find he committed these other acts or that he had a character trait that predisposed him to

commit the crimes charged." *See LeBlanc*, 186 Ariz. at 439, 924 P.2d at 443 (stating that jurors are presumed to follow a court's instructions). This concept was reinforced by the prosecutor, who told the jurors in her closing arguments:

> You can't say if you find that the defendant possessed child pornography in Tucson, that he possessed child pornography in Tempe, Arizona. A, plus B does not equal C. You can use that information as factors in arriving at your decision, but you can't just make that. And that's something that's very important.

**¶54** Based on the evidence, the trial court committed no error, let alone fundamental error, in admitting the challenged other act evidence. *See Lavers*, 168 Ariz. at 385, 814 P.2d at 342.

## CONCLUSION

**¶55** Appellant's convictions and sentences are affirmed.



Ruth A. Willingham · Clerk of the Court
FILED: gsh