NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA,
*Appellee,*

*v.*

ERIC JOEL VINCENT,
*Appellant.*

No. 1 CA-CR 14-0156
No. 1 CA-CR 14-0636
(Consolidated)

FILED 7-30-2015

Appeal from the Superior Court in Maricopa County
No.  CR2013-109623-001
The Honorable Karen L. O'Connor, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Eliza C. Ybarra
*Counsel for Appellee*

Maricopa County Public Defender's Office, Phoenix
By Louise Stark
*Counsel for Appellant*

---

**MEMORANDUM DECISION**

Judge Patricia A. Orozco delivered the decision of the Court, in which Presiding Judge Patricia K. Norris and Judge Maurice Portley joined.

---

**O R O Z C O**, Judge:

¶1        Defendant, Eric Joel Vincent, appeals from his convictions and sentences for one count of sexual abuse, a class 5 felony, and two counts of prostitution, each a class 1 misdemeanor.  He argues the trial court abused its discretion when it denied his motion to sever the charges against the two separate victims for trial and violated his due process rights by ordering him to register as a sex offender after sentencing was concluded. For the following reasons, we affirm.

**FACTS[1] AND PROCEDURAL HISTORY**

¶2        This case involves three offenses that occurred on two separate nights, within two days of each other, and with two different female victims.  The first offense occurred during the late evening of February 19 and the early morning of February 20, 2013, when Defendant, a Discount Cab driver, picked up Hannah at an "eating disorder facility" to take her to the airport.  On the trip to the airport, Hannah used Defendant's cell phone to call her father to verify the airline carrier he had chosen and learned that her father was unable to buy a ticket for that evening.  Hannah debated whether to stay overnight at the airport, but both Defendant and her father counseled her that it would be "smarter to go back to the facility." After her father ascertained that the facility would take her back that night, she acquiesced.

¶3        The cab ride to the airport was uneventful, and Hannah paid defendant the $40 fare using a credit card.  On the return to the facility, Defendant informed Hannah that he did not want her to have to pay $80 for the entire trip and said that they "could make a deal for the ride back."

---

[1]    We view the evidence in the light most favorable to sustaining the convictions and resolve all reasonable inferences against defendant.  *State v. Karr*, 221 Ariz. 319, 320, ¶ 2 (App. 2008).  We also resolve any conflict in the evidence in favor of sustaining the verdicts.  *State v. Guerra*, 161 Ariz. 289, 293 (1989).

When Hannah asked him what he had in mind, Defendant "kept saying, do you have any suggestions." Hannah was "confused" and told Defendant that she did not know what he was talking about. Defendant proceeded to ask her if she was "a crazy girl" and whether she did "anything crazy." Hannah demurred and informed him that she did not "do anything crazy," but Defendant continued to suggest that they could "make a deal" and stated, "well you can come up front and I can pull over and you can give me a blow job or a hand job." When Hannah told Defendant that she did not want to do that, Defendant "just said why, why not?" She continued to tell Defendant "no."

¶4        When they arrived at the facility, Defendant turned off the cab's lights and stopped the vehicle. He swiped Hannah's credit card for the fare, but informed her that it was "declined." He then told her that no one saw them with the headlights off and that they could still "do the offer" if she was interested. Hannah knew there was still money on her card, but she used defendant's cell phone to call her father who confirmed the card had sufficient funds. Using the apparatus on his cell phone, Defendant then swiped her card, and Hannah "signed . . . and got out." Defendant told her that what had happened in the cab "[did not] need to be discussed" and also that "what happens in the cab, stays in the cab." Hannah attempted to get the license plate of the cab, but Defendant kept blocking it. At the facility, Hannah recounted what had happened in the cab to a nurse, and a report was made to police. Defendant was identified through his cell phone number, the cab company's records of the fare, and the victim's description of him.

¶5        A second set of offenses occurred in the early morning hours of February 22, 2013. At approximately 3:00 a.m., Cami, a twenty-two year old who had been drinking at a party with friends, felt "a little buzzed" and decided to call a cab for a ride back to her home. She called Discount Cab and Defendant was the cab driver who picked her up. When Cami attempted to get in the back seat of Defendant's vehicle, she found that the door was locked. She opened the front passenger door and asked Defendant if she "should just sit up front," to which he replied "yes." With some "apprehension" she sat next to Defendant in the front seat.

¶6        During the drive, Defendant asked Cami if she was familiar with "Taxi Cab Confessions." Defendant then began asking her "a lot of sexual questions." Cami felt "[v]ery uncomfortable," but reluctantly answered Defendant, because she was "scared." At some point Defendant asked her "what [she] would do for a free cab ride?" When Cami replied that she "would sing," Defendant responded by asking her if she "would

give him a hand job or a blow job." Cami replied "no" that she "would just pay," after which Defendant grabbed her left hand and "put it in his lap," specifically, "[i]n his groin, on his penis," over his clothing. Cami grabbed her arm back "very quick." Defendant also offered to "take it out of his pants," but never did. At that point, Cami was sufficiently scared that she digitized 911 on her cell phone in case Defendant did not turn into her subdivision.

¶7        When they arrived at her street, Cami made Defendant drop her off at a neighbor's house that she knew had security cameras. She hid there for several minutes until she saw Defendant drive away so that Defendant would not know precisely which house was hers. Cami ran home and went to bed. The following day, she told her parents what had happened. Her father called Mesa Police and the cab company to report the incident. Defendant was identified through his cell phone number captured by the victim's cell phone, the victim's description, and the cab company records of the fare.

¶8        After he was "suspended" by the cab company and informed that Mesa police were "looking for him," Defendant went to the police station. Defendant was read his Miranda[2] rights and he agreed to talk to the detective. When the detective told him that they were interested in him because of "incidents [that had] come up with him soliciting for sex acts," Defendant stated that it often "gets raunchy" in a cab. He initially denied having made offers for sex himself, but admitted seeing "boobs," watching other people make offers, and also accepting an offer to allow a couple to have sex in his cab. Defendant admitted to having "curiosity of sex, sex in a cab, watching, doing," and stated that cab drivers he knew had a story to tell and he wanted his story.

¶9        Once the detective claimed to have a couple of recorded telephone calls, Defendant admitted that he had offered a female a cab ride for "a hand or a blow job" but that she refused and "he left it at that." Defendant denied having touched this female and maintained that "he would ask and if they said no, he would just continue on." Defendant also admitted picking up another woman to take her to the airport and offering her "a blow job in return for a cab fare, coming back from the airport to her destination." Defendant claimed that he "was out to help people out [;] [s]o if he could save somebody $20 here or there, he was going to do it." Defendant never told the detective that he was "just joking" or posing "just a hypothetical" when he made these offers to passengers. He indicated that

---

2        *See Miranda v. Arizona*, 384 U.S. 436 (1966).

his "standard offer" in exchange for a cab fare was "a hand or blow job" and he would tell customers "the offer is on the table" if they initially refused.

**¶10** The State charged Defendant with one count of sexual abuse of Cami, for forcing her to touch his groin (Count 1), and two counts of prostitution for soliciting sex from Cami and Hannah (Counts 2 and 3, respectively). A jury found Defendant guilty of the offenses as charged, and the trial court sentenced Defendant to lifetime probation on the sexual abuse conviction, two concurrent three-year terms of probation on each of the prostitution convictions, and ninety days in jail. Defendant requested and was granted leave to file a delayed notice of appeal. We have jurisdiction pursuant to Article 6, Section 9, of the Arizona Constitution and Arizona Revised Statutes (A.R.S.) sections 12-120.21.A.1, 13-4031 and -4033.A (West 2015).[3]

## DISCUSSION

I.     Denial of Motion to Sever

**¶11** Prior to trial, Defendant moved to sever the trials for the two victims pursuant to Arizona Rules of Criminal Procedure 13.3 and 13.4. He argued that severance was appropriate because the offenses were not part of a common scheme or plan and admission of evidence of the other charges would be irrelevant and prejudicial. The State argued that severance was not proper because (1) the separate offenses were part of a common scheme or plan, (2) the evidence of the separate offenses was cross-admissible at separate trials pursuant to Arizona Rule of Evidence 404(b), and (3) the evidence was also admissible pursuant to Arizona Rule of Evidence 404(c). After holding a hearing on the motion, the trial court ruled that severance was not warranted because the offenses were of the "same or similar character as well as based on the same conduct" and because evidence of the offenses would be cross-admissible at trial under either Arizona Rule of Evidence 404(b) "as proof of Defendant's identity, modus operandi, and intent" or under Rule 404(c) as providing a reasonable basis to infer that Defendant had a "character trait giving rise to an aberrant sexual propensity to commit the crimes charged." The court also specifically found that the admission of the acts was not "*unfairly* prejudicial" and that the evidentiary value of the charged acts was not "not *substantially* outweighed by the danger of unfair prejudice." The trial court thus

---

[3]     We cite the current version of applicable statutes when no revisions material to this decision have since occurred.

concluded that Defendant was not entitled to severance and all the counts would be tried together "based in part on judicial economy."

**¶12** On appeal, Defendant argues that the trial court's ruling was an abuse of its discretion. He contends that he was entitled to severance pursuant to Arizona Rule of Criminal Procedure 13.4.b because the acts with the two victims were not the same or similar in character and therefore evidence of the separate acts was not cross-admissible under Rules 404(b) or 404(c). Initially we note that because Defendant did not renew his motion to sever at or before the close of evidence as required by Arizona Rule of Criminal Procedure 13.4.c, his claim is reviewable only for fundamental error. *See State v. Laird*, 186 Ariz. 203, 206 (1996); Ariz. R. Crim. P. 13.4.c. To prevail under this standard of review, the onus rests with Defendant to "establish both that fundamental error exists and that the error in his case caused him prejudice." *See State v. Henderson*, 210 Ariz. 561, 567, ¶ 20 (2005). However, before, we even engage in fundamental error review, we must first find that the trial court erred. *State v. Lavers*, 168 Ariz. 376, 385 (1991). We conclude Defendant has not shown that the trial court committed error, let alone fundamental error.

**¶13** Under Arizona Rule of Criminal Procedure 13.3.a(1), offenses may be joined for trial when they are of the same or similar character. However, pursuant to Arizona Rule of Criminal Procedure 13.4.b, when such offenses are joined solely by virtue of Rule 13.3.a(1), a defendant is entitled to severance as a matter of right, "unless evidence of the other offense or offenses would be admissible under applicable rules of evidence if the offenses were tried separately."

**¶14** Defendant argues that the trial court was "legally wrong" in finding that the acts, which were separated by two days, were "connected" in their commission or that they were the "same or similar in character" when Defendant could not choose who would get into his cab. The trial court found that "there was a high degree of similarity" among the acts because the incidents occurred within two days of each other, they involved similar "young, white female[]" victims, and they each involved Defendant offering the victim "a free ride in exchange for a 'hand job' or 'blow job.'" The court further noted that strength of the evidence that Defendant committed the act was "strong" because Defendant admitted that it was his "regular practice to proposition women for sexual favors in exchange for cab fare." The evidence supports the trial court's findings that the acts with the two victims were in fact "similar in character." *See* Ariz. R. Crim. P. 13.3.a. Moreover, the fact the acts were separated by two days is not dispositive. *See State v. Benson*, 232 Ariz. 452, 459, ¶¶ 15-17 (2013) (finding

severance was not required when the acts occurred nearly three years apart).

**¶15** The question then is whether the evidence of the acts was admissible "under applicable rules of evidence if the offenses were tried separately," as the trial court also found. *See* Ariz. R. Crim. P. 13.4.b. Rule 404(b) permits the admission of evidence of "other crimes, wrongs or acts" to show "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." Defendant argues that evidence was not admissible for any Rule 404(b) reason because there was no question of his identity, no defense based on mistake or accident, and no showing of "modus operandi," as the trial court mistakenly found. However, this argument ignores the fact that the evidence was admissible, as the trial court also found, to address the question of "intent," which was the focus of the defense at trial. As defense counsel stated at the severance hearing, while Defendant admitted that he uttered the words to the two victims, his argument was that "it was a joking back and forth" and "common banter" and that there was not "really any intent that a sexual act would be performed" or "that there would be any type of services rendered or money changed hands [sic]." Accordingly, defense counsel stated in her opening argument that it was about "context, state of mind and details," and that, while Defendant "[did] not contest these words were spoken," they were "hypothetical questions" and "cab banter" and that, once the jury heard the context in which they were spoken, it would find Defendant not guilty of prostitution. Likewise in her closing argument, defense counsel, stated that while "rude" words may have been spoken, "was it a joke . . . [w]as he just playing games, being funny . . . [t]hat is what you take back to the jury room, was it a joke[;] [w]as it going to happen[;] [w]as it a real effort?"

**¶16** On appeal, Defendant asserts, "As to the prostitution counts, the only criminal 'acts' were words." He further claims that evidence that he placed Cami's hand on his lap (Count 1) "had no bearing" on the prostitution charge related to his conduct with Hannah (Count 3). We disagree and hold the evidence of placing Cami's hand on his lap was admissible to prove Defendant's intent under Rule 404(b).

**¶17** "Intent is frequently shown by evidence of other criminal acts of the same character." *State v. Featherman*, 133 Ariz. 340, 345 (App. 1982) (citing *State v. Rose*, 121 Ariz. 131, 136 (1978)). Intent "is simply the state of mind that coexists with the doing of an act" and "the recurrence of an act controverts a claim that it was done by accident or mistake." *Rose*, 121 Ariz. at 136. *See also State v. Lee*, 25 Ariz. App. 220, 226 (App. 1975) (State is

permitted to produce similar acts or incidents to show defendant's intent and prove act for which he is on trial was not inadvertent or by mistake.). Intent may also "be established by subsequent acts . . . based on the idea that similar results do not usually occur through abnormal causes and that a recurrence of a particular act similarly tends to negate accident, inadvertence or other innocent mental state."  *Lee*, 25 Ariz. App. at 227.

**¶18**         Here evidence of acts involving the separate victims, including the evidence that he progressed from words to actions with Cami, was cross-admissible to counter Defendant's claims that his statements were not serious and not intended to solicit actual sexual favors from the victims.  Because the trial court properly found that the evidence was admissible pursuant to Rule 404(b), we need not address whether it was also admissible pursuant to Rule 404(c).  We also need not engage in fundamental error review because Defendant has not established that the trial court committed error.  *Lavers*, 168 Ariz. at 385.

II.     Imposition of Sex Offender Registration and Fee

**¶19**         On appeal, Defendant asserts the trial court improperly ordered Defendant to register as a sex offender after sentencing was concluded and without giving proper notice to Defendant, thereby violating his due process rights.  We review mixed questions of law and fact de novo.  *In re M.H.*, 222 Ariz. 567, 569 n. 3 (App. 2009) (citing *State v. Gonzalez-Gutierrez*, 187 Ariz. 116, 118 (1996)).

**¶20**         While Defendant is correct that the trial court's December 10, 2013 minute entry did not order him to specifically register as a sex offender, his argument disregards the trial court's oral pronouncements made on the same day.  The trial court declared, "I am going to place you on lifetime probation *with sex offender terms*, based upon everything that I have heard here today [] and at trial."  (Emphasis Added).  The trial court further ordered Defendant to pay the "sex offender registration fee of $250" and to "abide by the special conditions of probation, those being sex offender terms[.]"

**¶21**         On May 12, 2014, the trial court issued a minute entry stating:

The Court having been notified that Sex Offender Registration was not addressed in the Sentencing Minute Entry dated [December 10, 2013],

**IT IS ORDERED** Defendant shall register as a sex offender.

**¶22**        A trial court's authority to correct or modify a sentence is controlled by the Rules of Criminal Procedure. *State v. Superior Court*, 124 Ariz. 288, 289 (1979). Rule 24.4 permits a trial court to correct "[c]lerical mistakes in judgments, orders, or other parts of the record" that arise from "oversight or omission" at "*any time after such notice.*" (Emphasis added.) *See also State v. Hanson*, 138 Ariz. 296, 304 (App. 1983) (same).

**¶23**        "When a discrepancy between the trial court's oral pronouncement of a sentence and the written minute entry can be clearly resolved by looking at the record, the "[o]ral pronouncement in open court controls over the minute entry." *State v. Ovante*, 231 Ariz. 180, 188, ¶ 38 (2013) (quoting *State v. Whitney*, 159 Ariz. 476, 487 (1989)). From our review of the record of both the court's oral pronouncements at sentencing and the resulting minute entry, it is clear that the trial court fully intended to impose the requirement that Defendant register as a sex offender despite Defendant's arguments to the contrary. We find the fact that the December 10, 2013 sentencing minute entry failed to include language specifically requiring Defendant to register as a sex offender to be a clerical oversight as is further evidenced by the trial court's May 12 order correcting the omission. Although the May 12 order does not expressly state that it is correcting the December 10 minute entry, clearly that was the trial court's intent pursuant to Arizona Rule of Criminal Procedure 24.4.

III.    Due Process

**¶24**        We next address Defendant's due process argument. Due process requires that a defendant be given notice and an opportunity to be heard. *State v. Rivera*, 207 Ariz. 69, 73, ¶ 12 (App. 2004). The record reflects that Defendant and his counsel were present at the December 10 hearing and presented arguments opposing sex offender registration. Thus, Defendant was afforded sufficient due process and the trial court was not required to notify Defendant of its May 12 minute entry that simply recounted the sentence it imposed during the December 10 hearing.

**¶25** Because we are able to do so when the record clearly identifies the intended sentence, we affirm the trial court's oral pronouncement, including the court's order imposing sex offender registration, as well as the court's correction of the clerical error in the December 10 sentencing minute entry order to reflect that order. *See* <u>Ovante</u>, 231 Ariz. at 188, ¶ 39.

## CONCLUSION

**¶26** For the forgoing reasons, we affirm Defendant's convictions and sentences.



Ruth A. Willingham · Clerk of the Court
FILED : ama